BROWN v. STAPLE COTTON CO-OPERATIVE ASS'N.

(Division A. June 11, 1923.)

[96 South. 849. No. 23291.]

1. MONOPOLIES. *Law prohibiting contracts in restraint of trade held applicable only to those which in their effect are inimical to public welfare.*

Sections 5002 and 5003, Code of 1906, as amended, sections 3281 to 3285, inclusive, Hemingway's Code, defining unlawful trusts and combinations in restraint of trade and declaring all contracts made in furtherance thereof, whether expressed or implied, void and unenforceable, does not prohibit any and all contracts in restraint of trade, but only those which in their effect are inimical to the public welfare. The rule of reason will be applied. There must be an undue and unreasonable restraint of trade.

2. MONOPOLIES. *Contracts between nonprofit co-operative corporation and its members to systematically market long staple cotton held not invalid as inimical to public service.*

There was organized under the law of the state of Tennessee a corporation without capital stock, being a nonprofit co-operative association of producers of long staple cotton in Tennessee, Arkansas, and Mississippi, the purposes of the association being, to promote, foster, and encourage the business of marketing staple cotton intelligently, reducing speculation and stabilizing the market for such cotton, and co-operatively handling the problems of the growers thereof. The members of the association by contract with the association and with each other agreed to sell to the association for five years all the long staple cotton produced by them during that period, which cotton the association undertook by an elaborate system of warehousing, classifying, pooling the various grades, borrowing money thereon and advancing same to its members and marketing the cotton systematically and intelligently according to the market demands therefor, and accounting to each member for his proportionate share of sales when made. *Held*, such contracts are not inimical to the public welfare and are therefore not violative of said sections 5002 and 5003, Code of 1906, as amended, Hemingway's Code, sections 3281 to 3285, inclusive.

3. STATUTES. *Co-operative Marketing Act held persuasive as to what contracts not inimical to public welfare before adoption.*

Although the Co-operative Marketing Act, chapter 179, Laws of 1922. does not undertake to, nor could it, declare what the public policy of the state was prior to its adoption, still said statute is persuasive on the courts as to what contracts and combinations were not inimical to the public welfare recently before its adoption.

4. AGRICULTURE. *Constitutional law. Contracts between foreign co-operative marketing association and member subject to law existent before Co-operative Marketing Act as to contracts both prior and subsequent thereto; new remedy applicable to pre-existing contracts.*

Section 17(b) and section 24 of the Co-operative Marketing Act (chapter 179, Laws of 1922) provide that any co-operative marketing association organized under the laws of any other state coming into this state whose purposes and plans are substantially the same as those provided for in said act shall be entitled to the remedies of liquidated damages, injunction, and specific performance given by said act. The plans, purposes, and contracts provided for by a Tennessee corporation doing business in Mississippi are substantially the same as those provided for in said Co-operative Marketing Act. In a suit by such Tennessee corporation against a member for breach of his contract entered into before the adoption of said Co-operative Marketing Act, although the substantive rights of the parties are governed by the law as it stood before the adoption of said act, nevertheless such association is entitled to the remedies provided in said act, which are applicable to past as well as future contracts, under the principle that a remedy afforded by a statute passed subsequent to the date of a contract may be invoked by a party to such contract who has been wronged by its nonperformance.

5. DAMAGES. *Liquidated damages of ten cents per pound for long staple cotton undelivered by members of co-operative marketing association held reasonable.*

On account of the difficulty of ascertaining onything like an accurate estimate of the damages which such a co-operative marketing association would suffer on account of the breach of contract by a member in failing to make delivery as agreed, a stipulation in such contract fixing a sum as liquidated damages to be paid by such member will be upheld, provided the sum fixed is not so large as to be out of proportion to any loss which the association may have suffered. Under this principle and

the facts of this case, the sum stipulated between the associa-toin and its members of ten cents per pound to be paid by the latter for all cotton undelivered is reasonable.

APPEAL from chancery court of Holmes county.

HON. T. P. GUYTON, Chancellor.

Suit by the Staple Cotton Co-operative Association a-gainst J. A. Brown. From a decree for plaintiff, defend-ant appeals. Affirmed.

Appellee, Staple Cotton Co-operative Association, filed its bill in the chancery court of Holmes county against appellant, J. A. Brown, for the specific performance of and to enjoin appellant from further breaching a contract theretofore entered into by said parties and to recover damages for the breach thereof to the extent said breach had already taken place. There was a final decree for appellee according to the prayer of the bill, from which appellant prosecutes this appeal.

The cause was tried alone on the pleadings—original bill, demurrer thereto, and motion to dissolve the injunc-tion which had been issued on the filing of the bill. Ap-pellee made the following case by its bill and exhibits:

On September 1, 1921, appellant entered into a con-tract with appellee, a corporation organized under the laws of the state of Tennessee, being a nonprofit co-opera-tive association of producers of Staple cotton in Mis-sissippi, Arkansas, and Tennessee. Appellant agreed to sell and deliver to appellee all the cotton produced by him during the years 1921 to 1925, inclusive. He vio-lated his contract by selling a portion of his 1922 crop to other parties than appellee, and threatened further breach of said contract by disposing of the remainder of his 1922 crop to other parties. In its bill appellee sought to avail itself of the remedies afforded by the Cooperative Market-ing Act of this state. Chapter 179, Laws of 1922. Ap-pellee was organized under the laws of Tennessee on May 23, 1921, and thereafter was domesticated in this state

according to the laws thereof. Appellee association was formed under an enabling act of the legislature of Tennessee (Tennessee Code, sections 2188b1-2188b30; Shannon's Ann. Code, 1918, vol. 5, p. 6561), providing for the organization of co-operative agricultural associations. A copy of appellee's articles of association was attached to the bill and made an exhibit thereto. They state, among other things, that the incorporators were authorized to organize a co-operative association without capital stock to be known as Staple Cotton Co-operative Association for the purpose of promoting, fostering, and encouraging the business of producing and marketing staple cotton co-operatively, reducing speculation in cotton, stabilizing the local cotton markets, co-operatively and collectively handling the problems of cotton growers, said association to be organized and operated for the mutual help of its members and not for profit. Among the corporate powers of appellee as enumerated in its articles of association are the following:

"This association may not enter into any combination or agreement with any person, firm or corporation, or association, to regulate or fix the price of any article or commodity; or to maintain any price so regulated or fixed or otherwise, or to limit the amount of any commodity. This association shall not restrain or attempt to restrain the freedom of trade or production, or monopolize or attempt to monopolize the production, control or sale of any commodity or the prosecution, management or control of any kind of business; or engross or forestall or attempt to engross or forestall any commodities; or destroy or attempt to destroy competition in the manufacture or sale of a commodity in any way whatsoever; but on the contrary, all the activities of this association shall be nonprofit and co-operative in character, for the mutual benefit of its members, and shall be limited to the activities arising out of the financing of its members or the grading, storing, warehousing and marketing of the cotton of its members only.

"The association shall encourage, foster, and promote the production of cotton and do everything possible to eliminate and minimize speculation and manipulation by speculators in marketing of cotton and shall do everything within its power to secure the planting of the most desirable and profitable varieties of cotton, and to secure the largest quantity of production thereof; and to market the cotton as directly as possible to the spinners throughout the world, and to extend the distribution thereof to the manufacturing spinners in the world markets under conditions that will tend toward the economic manufacture of cotton and will enable the ultimate consumers of cotton and cotton products to secure cotton and cotton products with the least possible waste, due to extravagant or manipulative channels of trade; and the association shall make every effort to secure for its members the best current prices for the particular variety, grade and quality of cotton produced by them under normal market conditions; and the association shall extend the freedom of trade to the widest limits, and shall do all in its power to prevent the monopolization of the production of cotton or the sale of cotton; and shall prevent all efforts to destroy competition in the sale of cotton by any means whatsoever; and shall devote its efforts to the widening of the cotton markets and the elimination of everything that tends to the restraint of trade and monopolization; and the association shall make every effort to prevent unnecessary transactions in the commercial handling of cotton between grower and consumer, and to reserve for the growers and the public generally the profits and economies which may result from the establishment of direct channels of trade between the growers, acting as a co-operative association, and the spinners or their agents, acting as manufacturers of cotton and cotton products on a stabilized basis."

The articles provide further that membership in appellee association is limited to its patrons. Certificates of

membership are not transferable, each member is limited to one vote, and no voting by proxy is permitted. Provision is made for liability of members for the debts of the association, the adoption of a code of by-laws, the election of a board of directors and officers, and removal of such directors and officers. Appellee association is only authorized to handle the staple cotton produced by its members. Appellant was a citizen of this state and a grower of staple cotton. His contract with the appellee is attached to the bill as an exhibit thereto. Its pertinent provisions are as follows: It is divided into two parts, an association agreement and a marketing agreement. The former became binding as soon as it was signed by appellant; the latter became binding when accepted by appelleee. Appellee's association agreement embodied the plan according to which the association was organized. It declared that the purpose of the parties to the contract was substantially the same as set forth in the articles of association. It is specifically stated in the contract that appellant entered into said agreement "in consideration of similar undertakings by his fellow growers." The agreement limits membership to actual growers of staple cotton or landlords who receive rental in such cotton. It provides for twenty-one directors; that each member is limited to one vote; that an entrance fee of ten dollars be paid by each member; that the association confine itself to purposes of marketing cotton for its members only.

The provisions of the marketing agreement which are involved in this suit are in the following language:

"The Staple Cotton Co-operative Association, a co-operative association, with its principal office at Memphis, Tennessee, hereinafter called the association, first party, and the undersigned grower, second party, agree:

"1. The grower is a member of the association and is helping to carry out the express aims of the association for co-operative marketing, for minimizing speculation and waste and for stabilizing cotton markets in the interests

of the grower and the public, through this and similar obligations undertaken by other growers.

"2. The association agrees to buy and the grower agrees to sell and deliver to the association all of the cotton produced or acquired by or for him during the years 1920, 1921, 1922, 1923, 1924. If the required minimum is not secured by September 15, 1920, the crop of 1920 shall be excluded and the crop of 1925 shall be added hereto.

.  .  .

"4. (a) All cotton shall be delivered at the earliest reasonable time after picking or ginning, to the order of the association, at the warehouse controlled by the association; or at the nearest public warehouse, if the association controls no warehouse in that district; or by shipment as directed, to the association, and by delivery of the indorsed warehouse receipts or bills of lading properly directed.

.  .  .

"5. (a) The association agrees to resell such cotton, together with cotton of like quality, grade, and staple, delivered by other growers under similar contract, at the best prices obtainable by it under market conditions, and to pay over the net amount received therefrom (less freight insurance and interest) as payment in full to the grower and growers named in contracts similar hereto, according to the value of the cotton delivered by each of them, after deducting therefrom, within the discretion of the association, the cost of maintaining the association and of handling, grading and marketing such cotton; and of reserves for advertising, credits and other general commercial purposes (said costs and reserves not to exceed three per cent. of the aggregate gross resale price). The annual surplus from such deductions must be prorated among the growers delivering cotton in that year on the basis of deliveries.  .  .  .

"6. The association shall pool or mingle the cotton of the grower with cotton of a like quality, grade and staple delivered by other growers. The grower agrees that his

132 Miss.—55

cotton may be so mingled; and that the net returns therefrom, less all costs advances and charges, shall be credited and paid to him on a proportional basis out of the receipts from the sale of all such cotton of like quality, grade, and staple, each pool to be for a full season; payments to be made from time to time, as rapidly as possible in due proportion, until the accounts of each pool of the season are completely settled. . . .

"11.  The grower shall have the right to stop growing cotton and to grow anything else at any time at his free discretion; but if he produces any cotton, or acquires or owns any interest in any cotton, during the term hereof, it shall be included under the terms of this agreement and must be sold only to the association.

"12.  Nothing in this agreement shall be interpreted as compelling the grower to deliver any specified quantity of cotton per year; but he shall deliver all the cotton produced or acquired by or for him. . . .

"15.  This agreement is one of a series generally similar in terms, comprising with all such agreements, signed by individual growers, or otherwise, one single contract between the association and the said growers mutually and individually obligated under all of the terms thereof.  The association shall be deemed to be acting, in its own name, for all such growers in any action or legal proceedings on or arising out of this contract. . . .

"17.  (a) Inasmuch as the remedy at law would be inadequate; and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the association, should the grower fail so to sell and deliver all of his cotton, the grower hereby agrees to pay to the association for all cotton delivered, sold, consigned or marketed by or for him other than in accordance with the terms hereof, the sum of ten cents per pound as liquidated damages for the breach of this contract; all parties agreeing that this contract is one of a series dependent for its true value upon the adherence

of each and all of the growers to each and all of the said, contracts.

"(b) The grower agrees that in the event of a breach or threatened breach by him of any provision regarding delivery of cotton, the association shall be entitled to an injunction to prevent breach or further breach hereof and to a decree for specific performance hereof; and the parties agree that this is a contract for the purchase and sale of personal property under special circumstances and conditions, and that the buyer cannot go to the open markets and buy cotton to replace any which the grower may fail to deliver.

"(c) If the association brings any action whatsoever by reason of a breach or threatened breach hereof, the grower agrees to pay to the association all costs of court, costs for bonds and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fees expended or incurred by it in such proceedings; and all such costs and expenses shall be included in the judgment and shall be entitled to the benefit of any lien securing any payment hereunder. . . .

"20. It is expressly agreed that this instrument is one of a series substantially identical in terms. All such instruments shall be deemed one contract for the purpose of binding the subscribers, to the same extent as if all of the subscribers had signed only one such contract."

Appellee association when the bill in this cause was filed had performed all of its covenants with appellant. It had expended money in reliance upon appellant's agreement, had engaged employees, leased buildings, executed contracts, and borrowed money to advance its members upon the assumption that appellant as well as his fellow members, something over two thousand in number, would live up to their contracts.

On March 28, 1922, after the contract here involved had been made, the Co-operative Marketing Act became a law of this state (chapter 179, Laws of 1922). This statute

authorized the organization in this state of agricultural co-operative marketing associations with substantially the same purposes and powers as are possessed by appellee association under its charter granted by the laws of the state of Tennessee. In its first section the act declares its purposes are to promote, foster, and encourage the intelligent and orderly marketing of agricultural products through co-operation, and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producers and consumers; and to stabilize the marketing of agricultural products.

Section 17 (b) of the act provides as follows:

"In the event of any breach or threatened breach of such marketing contract by a member or other person, the association shall be entitled to an injunction to prevent the breach or further breach of the contract, and to a decree of specific performance thereof. Pending the adjudication of such an action and upon filing a verified complaint showing the breach or threatened breach, and upon filing a bond in the sum of one hundred dollars, the association shall be entitled to an injunction against the member or other person, provided, however, that the chancellor in his discretion may increase such bond to five hundred dollars after a hearing on five days' notice to the parties, if justice demands such increase in the amount of said bond."

And section 24 makes this provision:

"Any co-operative marketing association, organized under appropriate laws of any other state, for the purposes and with the restrictions and limitations substantially the same as those set forth herein, may operate and do business in this state with all the rights, powers and privileges granted to any co-operative marketing association incorporated under this act, upon compliance with any or either of the laws of this state regarding the qualifications of foreign corporations, to carry on business within this state."

After said chapter 179, Laws of 1922, had been adopted appellant breached his said contract with appellee association. He sold ten bales of his 1922 crop to the Holmes County Cotton Company. He had thirty bales on hand but informed appellee that he would not deliver the same to it, but proposed to sell it to others in the open market. Thereupon on November 15, 1922, this suit was commenced in the chancery court. The bill asked for liquidated damages for the cotton already sold by appellant, for an injunction, and a decree of specific performance as to the cotton in the hands of appellant, and such cotton as he might produce thereafter during the life of his said contract, which relief the court in its final decree granted.

*P. P. Lindholm,* for appellant.

The demurrer raises the question that the contract sued on violates the Anti-Trust Laws of Mississippi in that it is monopolistic, is in restraint of trade, and is void as against public policy. The marketing agreement provided, in effect, that all cotton of the members must be delivered to the association for the five year period from 1921 to 1925. This cotton must be sold, not by the members themselves, each acting separately, but must be sold by the association. This cotton is to be graded, handled and marketed entirely by the association. Clearly there could be no such competition if all the members, acting separately for themselves, were engaged in selling their cotton. For the present case the cotton can only be sold by the officers and employees of the association, which necessarily tends to stifle competition. Just such a case was before our supreme court in *Retail Lumber Dealers Association* v. *State,* 95 Miss. 337, 48 So. 1021, construing the Code of 1906, section 5002. See, too: *Burns* v. *Wray Farmers' Grain Company,* 65 Colo. 425, 176 Pac. 487, 11 L. R. A. 1179; *Reeves* v. *Decorah Farmers' Co-operative Society,* 160 Iowa, 194, 140 N. W. 844, 44 L. R. A. (N. S.) 1104.

The complainant is not entitled to the specific perform-
ance awarded him since the contract involves personal
property. *Bomer* v. *Canady,* 79 Miss. 222, 30 So. 638;
*Sims* v. *Vanmeter Lumber Co.,* 96 Miss. 449, 51 So. 459.

There is no mutuality in the contract. While the con-
tract requires the member to deliver his cotton, and pro-
vides for the payment of liquidated damages by him, at
the same time there is no provision for the payment of
liquidated damages by the association, if it fails to carry
out its contract. Mutuality of obligation is an essential
element of every enforceable agreement. 13 C. J. 331. The
ten cents per pound required by the contract to be paid
in the event of a sale of the cotton is a penalty and is
not enforceable. *Mississippi Railroad Commission* v. *G.
& S. I. R. Co.,* 78 Miss. 750, 29 So. 789. Crops covered by
this contract were not in existence at the time of the mak-
ing thereof. A person may make a present mortgage of
things having a potential existence. *McGowan* v. *Mayer,*
65 Miss. 537, 5 So. 98. While a growing crop may be mort-
gaged or contracted for, I submit that the crop covered by
this suit was not subject to the contract.

*M. L. Kaufman and F. H. Montgomery, Amici Curiae.*

I. THE LEGALITY OR ILLEGALITY OF THE CONTRACT IN
THIS CASE WILL BE DETERMINED IN THE LIGHT OF THE LAW
AS IT EXISTED ON THE DATE OF THE CONTRACT, AND NOT
IN THE LIGHT OF SUBSEQUENT LEGISLATION. *Muelle* v.
*Jones,* 40 Miss. 565; *Anding* v. *Levy,* 57 Miss. 51; *Decell* v.
*Lewenthal,* 57 Miss. 334; 9 Cyc. 576; *Richards* v. *City Lum-
ber Co.,* 101 Miss. 678; Section 26, chapter 179, Laws of
1922; Section 87, Constitution of Mississippi; *Y. & M.
V. R. Co.* v. *Southern R. Co.,* 83 Miss. 746; *State* v. *M. &
O. R. R. Co.,* 86 Miss. 172.

II. THE CONTRACT IN THIS CASE IS VOID AND UNEN-
FORCEABLE BECAUSE CONTRARY TO THE CONSTITUTION,
STATUTE LAWS, AND PUBLIC POLICY OF THE STATE. Sec-

tion 198, Constitution of Mississippi, chapter 149, Code
of 1906, chapter 69, Hemingway's Code; *Railroad Com-
pany* v. *Searles*, 85 Miss. 520; *Kosciusko Co.* v. *Wilson Co.*,
90 Miss. 551; *State* v. *Jackson Co.*, 95 Miss. 6, 48 So. 300;
*Retail Association* v. *State*, 95 Miss. 337, 48 So. 1021; *Se-
curities Company* v. *State*, 91 Miss. 195, 44 So. 785; *Reeves*
v. *Decorah Farmers Society*, 149 N. W. 844, 44 L. R. A.
(N. S.) 1104; *Georgia Exchange* v. *Turnipseed*, 62 So. 542;
*Cumming* v. *Union Company*, 164 N. Y. 401, 58 N. E. 525,
79 A. S. R. 655; *Pocahontas* v. *Powhattan Co*, 68 W. Va.
508, 56 S. E. 264; 116 A. S. R. 901; *Whitridge* v. *Mt. Ver-
non Co.*, 210 Fed. 302; *White* v. *Hertzberg*, 51 So. 355;
*People* v. *Milk Exchange*, 145 N. Y. 267, 27 L. R. A. 437;
*Ford* v. *Chicago Association*, 27 L. R. A. 298; *Arnold* v.
*Jones Company*, 44 So. 662; *Gay* v. *Brent*, 179 S. W. 1051;
*International Company* v. *Commonwealth*, 58 L. Ed. (U.
S.) 1284; 9 Cyc. 576; *Davis* v. *Minor*, 1 How. 183; *Thomp-
son* v. *State*, 54 Miss. 740; *Martel* v. *White*, 102 A. S. R.
341, 69 N..E. 1085, 185 Mass. 255; *Ludewese* v. *Farmers
Company*, 145 N. W. 475, 164 Ia. 197; *Burns* v. *Wray Co.*,
65 Colo. 425, 176 Pac. 487.

III. THE DAMAGES SPECIFIED FOR A BREACH OF THE
CONTRACT ARE NOT LIQUIDATED DAMAGES, BUT CONSTITUTE
A PENALTY AND ARE UNENFORCEABLE. *Coker* v. *Brevard*,
90 Miss. 64; *Bright* v. *Roland*, 3 How. 398; *Wright* v. *City
of Jackson*, 73 Miss. 598; *Burns* v. *Wray Farmers*, 65 Colo.
425, 176 Pac. 487; *Reeves* v. *Decorah Farmers*, 160 Ia. 194,
44 L. R. A. (N. S.) 1104, 140 N. W. 844; *Ludewese* v. *Farm-
ers Co.*, 164 Ia. 197, 145 N. W. 475; *Georgia Exchange* v.
*Turnipseed*, 9 Ala. App. 123, 62 So. 542; *Ford* v. *Chicago
Association*, 27 L. R. A. 298, 13 Cyc. 95 and 96; *Thorough-
good* v. *Walker*, 47 N. C. 15; *Berry* v. *Wisdom*, 3 Ohio State,
241; *Morse* v. *Rathburn*, 42 Mo. 594, 97 Am. Dec. 359;
*Long* v. *Towl*, 42 Mo. 545, 97 Am. Dec. 355; *Jones* v. *Mis-
sissippi Co.*, 116 Miss. 295, 76 So. 880; Chapter 179, Laws
of 1922, section 17, 13 Cyc. 97; *Bradstreet* v. *Baker*, 14
R. I. 546; *Doan* v. *Chicago Company*, 51 Ill. App. 353;
*Baird* v. *Toliver*, 6 Humph. (Tenn.) 186, 44 Am. Dec. 298.

IV.   CHAPTER 179, OF THE LAWS OF 1922 IS REPUGNANT
TO THE FOURTEENTH AMENDMENT OF THE CONSTITUTION
OF THE UNITED STATES, AND VOID.   Section 26, chapter 179,
Laws of 1922; XIV Amendment, Constitution of U. S.;
*Connolly* v. *Union Sewer Pipe Company,* 46 L. Ed. 679;
*Clelland* v. *Anderson,* 66 Nebr. 252, 5 L. R. A. (N. S.) 136,
92 N. W. 306, 96 N. W. 212, 98 N. W. 1075; Section 19,
chapter 179, Laws of 1922; *Duplex* v. *Dearing,* 65 L. Ed.
(U. S.) 349.

*R. C. McBee,* for appellee.

The people of Mississippi are farmers and agriculture
is its chief industry.   The life of the citizens of this state
has been intensely individual.   They have not in great
numbers combined in corporate or other business organi-
zations, nor have they been trained in their common in-
terests to promote their general welfare.   Nowhere on
the economic landscape is there a more pathetic figure
than the farmer with samples drawn from his cotton,
seeking a purchaser.   The farmer knows nothing of its
value, nothing of its future use, and nothing of its mar-
ket price save such meager knowledge as he may obtain by
consulting the two or three buyers who live in the near-
by town.   It may be that in the town a few miles away
a higher price prevails; it may be that in a neighboring
county there is a buyer who is in touch with the distant
mill, who is willing and able to pay a better price for the
farmer's produce than can be obtained in the farmer's
near-by town, but the farmer has no method of ascertain-
ing this fact nor of keeping in touch with the market.
From such conditions came the need for a radical change.
It was apparent that some system must be evolved where-
by the farmer could be assured of a price for his produce,
at least, better than the cost of production, and whereby
the consumer would not be injured.   The only method of
securing such results that is scientifically certain and

economically sound is by means of united action. The principles of co-operation which have been applied heretofore to industry and business generally are now being applied to the greatest problem of agricultural economics, that is the problem of marketing agricultural products. The legislature of Mississippi, realizing the demand for such legislation, passed the Co-operative Marketing Act, approved March 28, 1922. The Staple Cotton Co-operative Association herein was organized under the laws of the state of Tennessee in May, 1921. It qualified to do business in Mississippi under the co-operative marketing act of Mississippi, with "all rights, powers and privileges granted to any co-operatve marketing association incorporated under this act."

It is contended that the association contract places the sale of the cotton in the hands "of a trustee for the purpose of the sale of such cotton," and this is a violation of the Mississippi anti-trust law. But see *Yazoo & M. V. R. Co.* v. *Searles*, 85 Miss. 520, 37 So. 939.

The Marketing Agreement now under consideration does not anywhere provide that the cotton shall not be sold to any person, nor that it shall not be sold in any market; but, on the contrary, the declared purpose is "to extend the freedom of trade to the widest limits, and to do all in its power to prevent monopolization of the production of cotton or the sale of cotton, and to prevent all efforts to destroy competition in the sale of cotton by any means whatsoever, and shall devote its efforts to the widening of the cotton markets and the elimination of everything that tends to the restraint of trade and monopolization." The result of these clauses in the Constitution is such that the association instead of stifling competition in the remotest degree has brought about the fiercest sort of competition for the cotton of its members. In the case of *Burns* v. *Wray Farmers Grain Company*, 56 Colo. 425, and in the case of *Reeves* v. *Decorah Farmers Co-operative Society*, 44 L. R. A. (N. S.) 1104, each organization

was for pecuniary profit. The profits of each were distributed to the members in the form of dividends, and while the members were required to sell to these organizations, if any person bought from them, he must buy at a profit. Of course, he could not compete with the organization. In the present case the association, as we have seen, has no money and it cannot buy the cotton of its members. It can make no profit for it must pay over to them the entire proceeds of the cotton, less the expenses and deductions. Therefore, these cases are not in point.

THE CONTRACT IS NOT IN RESTRAINT OF TRADE. Contracts by dairymen to deliver all of their milk to creameries established by them does not offend the law as being an illegal monopoly or an unreasonable restrain of trade. *Castorland Milk & Cheese Co.* v. *Shantz,* 179 N. Y. Supp. 31; *Bullville Milk Producers Association* v. *Anderson,* 178 N. Y. Supp. 612. See also *Ex Parte Baldwin County Producers Corporation,* 83 So. 69.

A contract in reasonable restraint of trade was valid before the enactment of the statute where its design and purpose was not to create a monopoly, and such contract is valid now where it is only such as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public. *Y. & M. V. Railroad Co.* v. *Crawford,* 107 Miss. 355, 65 So. 462; *Railroad Co.* v. *Searles,* 85 Miss. 520, 37 So. 939; *Sivley* v. *Cramer,* 105 Miss. 13, 61 So. 652. "The courts must be left to determine what does or does not constitute a monopoly within the Code of 1906, section 5002, as amended by Laws of 1908, chapter 119, prohibiting contracts in restraint of trade and contracts monopolizing business as the questions arise in each case." *Cumberland Telephone & Telegraph Co.* v. *State,* 54 So. 670.

THE ASSOCIATION IS ENTITLED TO AN INJUNCTION AND A DECREE FOR SPECIFIC PERFORMANCE. This is a contract in

which the individual sellers composing a distinct entity are as such, buyers of their own product. It is, of course, a contract for the sale of personal property. *Bomer* v. *Canady*, 79 Miss. 222, holds: "Doubtless there are cases where equity will decree the specific performance of contracts for the delivery up of chattels even over those cases in which the *pretium affectionis* attaches to them, but they are exceptional cases." The present case is such an exceptional one and comes clearly within the rule that in such a case a court of equity will decree specific performance. "It is now well settled that when the chattels are such as are not obtainable in the market, or can only be obtained at great expense and inconvenience, and the failure to obtain them causes a loss which could not be adequately compensated in an action at law, a court of equity will decree specific performance." *Texas Co.* v. *Central Fuel Oil Co.,* 194 Fed. 1; *Equitable Gaslight Co.* v. *Baltimore Coal Tar. & Mfg. Co.,* 63 Md. 285; *Gloucester Isinglass & Glue Co.* v. *Russiz Cement Co.,* 154 Mass. 92, 27 N. E. 1005; 12 L. R. A. 563; 26 Am. St. Rep. 214; *Offutt* v. *Offutt,* 106 Md. 236; 67 Atl. 138; 12 L. R. A. (N. S.) 232; 124 Am. St. Rep. 491; *Harris* v. *Perry,* 215 Pa. 174, 64 Atl. 334; *Richmond* v. *Dubuque, etc. R. R. Co.,* 33 Iowa, 480; *Chehak* v. *Battles,* 133 Iowa, 107, 110 N. W. 330, 8 L. R. A. (N. S.) 1130; *Law* v. *Smith,* 68 N. J. Eq. 81, 59 Atl. 327; *Newton* v. *Wooley,* (C. C.), 105 Fed. 541; *Curtice Bros.* v. *Catts,* 72 N. J. Eq. 831; 25 R. C. L. 293, 294; *Southern Express Co.* v. *West N. C. R. R. Co.,* 99 U. S. 191, 25 U. S. (L. Ed. 319; 2 Story, Eq. Jur., sec. 728; *Stuyvesant* v. *Mayor of N. Y.,* 11 Paige, 414; *Barr* v. *Lapsley,* 1 Wheat, 151; *Storer* v. *Ry. Co.,* 2 You. & C. (N. R.) 48; *Wilson* v. *Furness R. R. Co.* (L. R.), 9 Eq. 28. Specific performance has been granted of contracts involving tomatoes, hops, coal, tar, fish, skins, ore, oil, and ships. *Livesley* v. *Johnston,* 45 Ore. 30, 106 Am. St. Rep. 647; *Equit. Gas. Light Co.* v. *Scranton Coal Tar Co.,* 63 Md. 285; *Amer. Smelting & Ref'n. Co.* v. *Bunkerhill*

*Co.* 248 Fed. 172; *Texas Co.* v. *Central Fuel Oil Co.,* 194
Fed. 1; *Great Lakes & St. L. T. Co.* v. *Scranton Coal Co.,*
239 Fed. 603. In each of these cases the court found that
the necessary and essential feature for the application of
equitable principles existed, that is, the lack of a plain,
speedy, adequate remedy at law. In the present case
these essentials exist.

The demurrer challenges the bill on the ground that
there is no mutuality in the contract, and it is contended
that mutuality of obligation is an essential element of
every enforceable agreement. It is not pointed out where-
in the contract is lacking in mutuality, except that the
brief of appellant argues that the contract does not re-
quire payment of liquidated damages if the association
fails to carry out its contract. "Mutuality does not re-
quire that the parties have the same remedies against each
other." 13 C. J. 333; *Northern Central Railway Co.* v.
*Walworth,* 193 Pa. 207, 74 Am. St. Rep. 683. Appellant's
brief assumes that the contract provides for a penalty
and not for liquidated damages. In construing a contract
to determine whether a clause calls for liquidated dam-
ages or penalty, the intention of the parties is the thing
the court is anxious to ascertain and give effect to. *Jones*
v. *Mississippi Farms Co.,* 116 Miss. 295, 78 So. 880;
*Wise* v. *United States,* 249 U. S. 361, 63 L. Ed. 647; *Sun
Printing & Publishing Association* v. *Moore,* 183 U. S. 642,
46 L. Ed. 366; *Anheim Citrus Fruit Association* v. *Yoe-
man,* 197 Pac. 959. The last ground of demurrer is that
the crops of appellant were not in existence at the time
the contract was made, because the marketing agreement
was signed September 1, 1921, and the crops were grown
during the year, 1922, and that the crops sued for were
not only for the year 1922 but the years 1923 to 1925 in-
clusive. In *McCown* v. *Mayer,* 65 Miss. 537, 5 So. 98, cited
by counsel for appellant, the single question presented
by this appeal was "whether the owner of the soil may
make a sale, valid and enforceable at law, of a crop to be

hereafter planted on his land." The court held: "We consider the point as settled in the affirmative by the case of *Everman* v. *Robb,* 52 Miss. 653." To the same effect, see: *Fidelity & Deposit Co. of Maryland* v. *B. F. Sturdevant,* 86 Miss. 520, 38 So. 583.

*Aaron Sapiro,* of San Francisco, for appellee.

The Co-operative Marketing Act of Mississippi governs the remedies of plaintiff. Plaintiff's rights are based upon a valid contract; its remedies are based upon a valid statute. It would appear as though *amici curiae* have confused rights and remedies. They argue that the validity of the contract between Brown and the association depends upon the law which was in existence at the time the contract was made and they conclude, "we will discuss the case without reference to the merits or demerits of chapter 197 of the Laws of 1922." We do not contend, nor is it necessary to contend, that the Co-operative Marketing Act validated a prior invalid contract. As we have heretofore stated, Brown's contract with the association was a legal agreement when made, enforceable in any court. The method of enforcement depends upon the law which was in force at the time this suit was commenced. In other words, plaintiff is entitled to invoke any remedy provided by the Co-operative Marketing Act. The act says that the association is entitled to the remedies of liquidated damages, injunction and specific performance. These remedies were properly granted by the chancellor. We cite *McMillan* v. *Sprague,* 4 Howard, 647; *Wood* v. *Buie,* 5 Howard, 285; and *Coffman* v. *Bank of Kentucky,* 40 Miss. 29, holding that a remedy created by the legislature subsequent to the date of the contract, may be invoked by the party to the contract who has been wronged by non-performance. The benefits of the Marketing Act are open to any group of farmers who organize a Co-operative Marketing Association. The inhibition

against special laws does not apply to the case. This was the conclusion of the supreme court of Oregon in *Oregon Growers Association* v. *Lentz,* decided February, 1923. The contract itself is plainly valid, and was valid when it was executed. We do not invoke the 1922 statute to support the contract. *Amici curiae* quote sections 3281, 3282, 3283, and 3285 of Hemingway's Code. They then seek to construe these sections, but their construction is different from that heretofore adopted by this court. Section 3281 provides that any combination or contract must be inimical to the public welfare before it would be held to be illegal. *Telephone Company* v. *State,* 110 Miss. 102; *Railroad Company* v. *Crawford,* 107 Miss. 355; and *Railroad Company* v. *Searles,* 85 Miss. 520, all hold that the statutes of this state do not prohibit any contract or combination containing restrictive features, unless detrimental to the public interest. So clearly is this the rule that in *Fire Insurance Companies* v. *State,* 75 Miss. 24, an indictment was held bad because it failed to allege in terms that the combination there under consideration injured the public. Therefore, in order to sustain the claim of *amici curiae* that Brown's contract with the association is illegal, it must be ascertained from the record in this case that there is something about this contract which injures the public; that there has been some act on the part of the association to the detriment of the people of the state. A most careful scrutiny of the record will show that there is nothing to justify a charge of this character. *Amici curiae* cite a number of cases which they say support their contention that the contract is void. But they ignore the fundamental distinction between agriculture and other industries—that group production and marketing are available to all industries except agriculture. They ignore the public welfare rule which has been repeatedly affirmed by this court. They ignore those economic considerations which must accompany judicial decision upon the sub-'ject of the restraint of trade. Obtaining a fair price for

the producer is a public purpose. We have cited a number of cases to this effect in our brief. A system of marketing which results in public benefit cannot at the same time be held to result in public detriment. We confess our inability to distinguish this case from *Railroad Company* v. *Crawford, supra,* and *Telephone Company* v. *State, supra,* except that in these decisions a stronger case of restraint of trade was made out. *Retail Lumber Dealers Association* v. *State,* 95 Miss. 337, involved an agreement to suppress competition; to put people out of business if they did not cease competing with the members of the association. This was very much the same as the secondary boycott, denounced in the Duplex Printing Company case. The Mississippi cases cited in the brief of *amici curiae* lay down the following rules: (a) It is illegal to fix prices without regard to supply and demand. (b) It is illegal to eliminate competition in a given territory so that producers are unable to obtain a fair price for their product. (c) It is illegal to harass and suppress competitors. (d) It is illegal to combine to fix the fares to be paid for transportation. This is the rule of the Standard Oil case, the American Tobacco case, decided in 1910, and the United States Steel case, decided in 1920. But there must be proof of such acts before the association or its contracts can be held to be in unreasonable restraint of trade.

There has never been a co-operative case decided in this country wherein it has been held that the co-operative contract is illegal. On the other hand we cite the following authorities, all of them holding that a true co-operative contract is valid and binding. *Oregon Growers Co-operative Association* v. *Lentz* (1923), 212 Pac. 811; *Burley Tobacco Society* v. *Gillaspie* (1912), 51 Ind. App. 583. 100 N. E. 89; *Ex parte Baldwin County Association* (1919), 203 Ala. 345, 83 So. 69; *Castorland Co.* v. *Shantz* (1919), 179 N. Y. Sup. 131; *Bullville Milk Producers Association* v. *Armstrong* (1919), 178 N. Y. Sup. 612; *Railroad Com-*

*pany* v. *Burley Tobacco Society* (1912), 143 S. W. (Ky.) 1040; *Anaheim Citrus Fruit Association* v. *Yeoman* (1920), 192 Pac. (Cal.) 959; *Washington Cranberry Association* v. *Moore* (1921), 201 Pac. (Wash.) 773; *Barnes* v. *Dairymen's League* (1923), Supreme Court, New York; *Texas Hay Association* v. *Hollingsworth* (1922), — S. W. (Tex.) —; *Burley Tobacco Growers* v. *Turner* (1923), — S. W. (Ky.) —.

Most of the cases cited by *amici curiae* were decided many years ago. Naturally, they do not take into consideration economic developments of the last few years. They do not discuss the modern rule on restraints of trade as established by the United States supreme court and the supreme court of Mississippi. The modern cases recognize that there is a fundamental distinction between manufacturers or merchants combining to fix prices and farmers combining to obtain a reasonable return for their year's toil. There is a fundamental distinction between a business which permits group production and marketing, and agricultural, wherein group production is impossible. The rule in Mississippi is the rule of the United States supreme court. Public welfare is the test. Without evidence of acts inimical to the public, a combination will be held legal. Under the Capper-Volstead Act the price which growers' associations may obtain for the products of their members may be limited by the Secretary of Agriculture. They cannot fix prices. They cannot manipulate markets and they cannot suppress competition. An association of consumers organized without profit, without centralized control, and in order to sell goods at a reasonable price to be limited by public authority is legal, unless acts inimical to the public welfare are proved against it.

The Co-operative Marketing Act does not represent a change in the public policy of Mississippi. It merely codifies public policy which has existed for many years. From the very beginning of the judicial history of this country

it has been held to be the policy of all governments, state and Federal, to increase the prosperity of the people. So strong has been this policy that constitutional provisions may be overridden to accomplish that end. The police power of the states includes not only protection of the health and physical wellbeing of the people, but also their material prosperity. *Barbier* v. *Connelly*, 113 U. S. 27. The Co-operative Marketing Act does not make new public policy. It merely codifies a long-established principle.

The liquidated damage provision of the contract does not provided for a penalty. It was therefore enforceable at common law. *Anaheim Citrus Fruit Association* v. *Yoeman, supra; Burley Tobacco Association* v. *Gillaspie, supra; Castorland* v. *Shantz, supra; Bullville Milk Producers Association* v. *Armstrong, supra; Ex parte Baldwin County Association, supra.*

The Co-operative Marketing Act is constitutional. Every case since 1902 wherein the classification of farmers was before the supreme court has held such classification to be constitutional. *German Alliance Insurance Company* v. *Lewis* (1914), 233 U. S. 389; *Miller* v. *Wilson* (1915), 236 U. S. 373; *New York Central Railroad Co.* v. *White* (1917), 243 U. S. 188; *Ward* v. *Krinsky* (1922), 42 Sup. Ct. Rep. 529; *National Union Fire Insurance Company* v. *Wanberg* (1922), *Smith* v. *Kansas City Trust Company* (1921). There is an obvious change in the tenor of judicial decision upon this subject. As economic conditions change, the law—and particularly constitutional law—changes with them. *State* v. *Lumber Company*, 102 Miss. 796; *Noble State Bank* v. *Haskell*, 219 U. S. 104; *People* v. *Lafetra*, 230 N. Y. 429. The supreme court of the United States and the court of appeals of New York both held the "rent laws" constitutional. *Block* v. *Hirsch* (1921), 256 U. S. 135; *People* v. *Lafetra* (1921), *supra*. Surely a reasonable return for the great agricultural community of Mississippi is just as important to the people as houses in the district of Columbia and the state of New York.

Argued orally by *F. H. Montgomery* for appellant and *Aaron Sapiro* and *R. C. McBee* for appellee.

ANDERSON, J., after stating the facts as above, delivered the opinion of the court.

Appellant contends that the contract in question violates those provisions of our statute defining unlawful trusts and combines in restraint of trade which declare in substance all contracts, expressed or implied, void and unenforceable in the courts—"between two or more persons, corporations or firms or associations of persons, or between one or more of either with one or more of the others" in restraint of trade, or to increase the price of a commodity, or to hinder competition in the sale or purchase of a commodity, or to engross or forestall a commodity, or place the control to any extent "of business or the products and earnings thereof in the power of a trustee or trustees by whatever name called," or by the terms of which any other person or persons than the parties to such contract, or their proper agents and officers, shall be given the power to dictate or control the management of the business of said parties, or to unite or pool interest in the price of a commodity. Code of 1906, sections 5002 to 5003, inclusive; Hemingway's Code, sections 3281 to 3285, inclusive.

In considering this question it should be borne in mind that the case before the court is to be found in the allegations of appellee's bill well pleaded in connection with the bald provisions of the contract involved, and whatever reasonable inferences that may be drawn therefrom. The intent and purpose of the contract is not aided by any pleading on the part of appellant. If our anti-trust statute is to be applied literally, perhaps this marketing contract comes within its provisions. Every member of the appellee association by this contract (which is not only a contract with the association but with each member there-

of) has placed the control to *some extent* of the staple cotton produced or controlled by them in the hands of appellee. Therefore the question is whether our anti-trust statute should be construed according to its literal terms regardless of the results, or whether it is to be construed in the light of reason and with the view of promoting the public welfare.

Section 198, Constitution 1890, commanded the legislature to "enact laws to prevent all trusts, combinations, contracts, and agreements *inimical to the public welfare.*" (Italics ours.) In obedience to that command we have chapter 145, Code of 1906, sections 5002 to 5021, inclusive, as amended being chapter 69 Hemingway's Code, sections 3281 to 3285, inclusive. Putting the question differently, is this contract to be condemned even though it be not inimical to the public welfare? We think this question is answered in the negative by the following decisions of this court: *Insurance Co.* v. *State,* 75 Miss. 24, 22 So. 99; *Y. & M. V. R. R. Co.* v. *Searles,* 85 Miss. 520, 37 So. 939, 68 L. R. A. 715; *Tel. Co.* v. *State,* 100 Miss. 102, 54 So. 670, 39 L. R. A. (N. S.) 277; *Standard Oil Co.* v. *State,* 104 Miss. 886, 61 So. 981; *Sivley* v. *Cramer,* 105 Miss. 13, 61 So. 653-654; *Railroad Co.* v. *Crawford,* 107 Miss. 355, 65 So. 462, L. R. A. 1915C, 250; *Standard Oil Co.* v. *State,* 107 Miss. 377, 65 So. 468; Id., 104 Miss. 886, 61 So. 981.

*Insurance Company* v. *State, supra,* was an indictment under section 1007, Code of 1892, charging the insurance company with a violation of the anti-trust statute, section 4437, Code of 1892, chapter 56, Laws 1896, defining an insurance monopoly. The court held that the indictment was bad because it failed to charge that the effect of the trust was injurious either to some person or the public.

In discussing this question in the *Searles case, supra,* the court said that all combinations or contracts without regard to their purpose, intent, or effect by which the control of business is placed within the power of trustees or

other persons than the contracting parties, were not trusts in the meaning of section 4437, Code of 1892, chapter 88, Laws 1900, defining trusts and prohibiting contracts in restraint of trade; that the test of a trust and the essential of its existence is that the contract or combination be, on account of its actual results, obnoxious to the public policy, or be in itself and its necessary effect inimical to the public welfare.

We think it would be well in this connection to reiterate what was said in part in *Telephone Co.* v. *State, supra.*

"When this statute was enacted, it introduced into the law no new definition of what constituted a 'restraint of trade' or 'a monopoly.' It did not attempt to define either. These are questions to be determined in the light of the facts of each case and under the law relating to same as it stood before the statute was passed; otherwise there is no guide for the persons charged with the enforcement to be governed by. What does the statute mean when it prohibits contracts 'in restraint of trade?' Does it mean that any contract which in any way restrains trade shall be illegal? If so broad a meaning should be given to the statute as this, it would involve a destruction and disaster to the commercial world never dreamed of by its authors, and not comprehended within the evil intended to be rectified. The statute only intended to include within its provisions those contracts in restraint of trade, those monopolies, and attempts to monopolize that were invalid as against public policy before the enactment of the statute, and under such contracts in relation thereto could not be enforced as between the parties. A contract in reasonable restraint of trade was valid before the enactment of the statute, where its design and purpose is not to create a monopoly, and such contract is valid now. . . . The law as to what it now takes to make a contract in restraint of trade to monopolize or attempt to monopolize any business remains the same, but the parties who may sue and the penalties have been broadened. As

to what does or does not constitute a monopoly within the meaning of the statute is not always easy to decide. The courts must be left to determine these questions when they arise. The question is one of mixed law and fact of necessity."

And also what was said, in part, in *Railroad* v. *Searles, supra*:

"It is contended that all combinations or contracts, without regard to purpose, intent, or effect, by which the control, to any extent, of business, or of the products and earnings thereof, is placed within the power of trustees, or by which other persons than the contracting parties or their proper officers, agents, or employees are given the power to dictate or control the management of business, are prohibited by the terms of the act. If this narrow construction is in fact the legislative intent, the entire law would be open to the just criticism of being a wholly unnecessary, if not an unwarranted, invasion of the inherent right of the citizen to deal with his own as he pleases, if without injury to others. *Gage* v. *State,* 24 Ohio Cir. Ct. R. 724. Carried to its logical conclusion, this argument would prevent any two or more individuals engaged in business from employing the same agents or representatives, or from placing in the hands of the same individual the right to control their separate businesses."

It was held in the first *Standard Oil Case,* 104 Miss. 886, 61 So. 981, that where a bill was filed in the chancery court to recover the penalties imposed for a violation of the anti-trust act, if was necessary for the pleader to charge as a matter of fact that the sales alleged to have been made in violation of chapter 119, Laws of 1908, amending the anti-trust statutes, were for the purpose of destroying competition, and a failure to so allege rendered the bill demurrable. In *Railroad Co.* v. *Crawford, supra,* it was held that our anti-trust statute was only intended to embrace within its provisions those contracts in restraint of trade which were invalid as against public policy before

the enactment of said statute. And in the second *Standard Oil Case,* 107 Miss. 377, 65 So. 468, the court held that it was necessary for the state to allege that the sales there involved as constituting a violation of a provision of the anti-trust statute were made for the purpose of destroying competition. Is appellee's scheme as embodied in its articles of incorporation and its association and marketing contracts inimical to the public interest?

Contracts of co-operative marketing associations with their members similar to the one under consideration, the purposes and corporate powers of which associations were in all substantial respects the same as those of appellee association, have been upheld as not being in restraint of trade in the following cases: *Hollingsworth* v. *Texas Hay Co.* (Tex. Civ. App.), 246 S. W. 1068; *Anaheim Citrus Fruit Ass'n* v. *Yeoman,* 51 Cal. App. 759, 197 Pac. 959 (hearing by supreme court denied); *Tobacco Growers' Co-operative Ass'n* v. *Jones* (N. C.), 117 S. E. 174; *Poultry Producers* v. *Barlow* (Cal. Sup.), 208 Pac. 93; *Ore. Growers' Co-operative Ass'n* v. *Lentz* (Or.), 212 Pac. 811; *Ex parte Baldwin County Producers' Corporation,* 203 Ala. 345, 83 So. 69; *Washington Cranberry Growers' Ass'n* v. *Moore,* 117 Wash. 430, 201 Pac. 773, 204 Pac. 811; *Burley Tobacco Soc.* v. *Gillaspy,* 51 Ind. App. 583, 100 N. E. 89; *Castorland Milk & Cheese Co.* v. *Shantz* (Sup.), 179 N. Y. Supp. 131; *Bullville Milk Ass'n* v. *Armstrong,* 108 Misc. Rep. 582, 178 N. Y. Supp. 612; *Burley Tobacco Growers* v. *Turner* (Circuit Court of Kentucky).

Appellant to sustain his contention relies principally upon *Kosciusko Oil Mill Co.* v. *Wilson,* 90 Miss. 551, 43 So. 435, 8 L. R. A. (N. S.) 1053; *State* v. *Jackson Cotton Oil Co.,* 95 Miss. 6, 48 So. 300; *Retail Lumber Dealers' Ass'n* v. *State,* 95 Miss. 337, 48 So. 1021, 35 L. R. A. (N. S.) 1054; *Security Co.* v. *State,* 91 Miss. 195, 44 So. 785, 124 Am. St. Rep. 638; *Reeves* v. *Farmers' Ass'n,* 160 Iowa, 194, 140 N. W. 844, 44 L. R. A. (N. S.) 1104; *Ludewese* v *Farmers' Ass'n,* 164 Iowa, 197, 145 N. W. 475; *Ga.*

*Fruit Exchange* v. *Turnipseed,* 9 Ala. App. 123, 62 So. 542; *Cummings* v. *Union Blue Stone Co.,* 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655; *Pocahontas* v. *Powhatan Coal Co.,* 60 W. Va. 508, 56 S. E. 264, 10 L. R. A. (N. S.) 268, 116 Am. St. Rep. 901, 9 Ann. Cas. 667; *Whitridge* v. *Mt. Vernon Co.* (D. C.), 210 Fed. 302; *People* v. *Milk Exchange,* 145 N. Y. 267, 39 N. E. 1062. 27 L. R. A. 437, 45 Am. St. Rep. 609; *Ford* v. *Chicago Milk Ass'n,* 155 Ill. 166, 39 N. E. 651, 27 L. R. A. 298; *Gay* v. *Brent,* 166 Ky. 833, 179 S. W. 1051. An analysis of these cases, we believe, will show that they do not sustain appellant's contention.

*Kosciusko Co.* v. *Wilson* and *State* v. *Jackson, supra,* are companion cases. In each there was an attempt to create a complete monopoly of the business of buying cotton seed in a fixed territory. The court held that such an arrangement was inimical to the public welfare and violative of the anti-trust statute. *Retail Lumber Dealers* v. *State, supra,* involved an agreement to suppress competition. All those who competed with members of the association were sought to be put out of business. *Security Co.* v. *State, supra,* involved a holding company which was to be utilized to control competing railroad corporations and thereby fix the fares to be charged the public without regard to their reasonableness. *Reeves* v. *Farmers' Ass'n, supra,* involved a marketing association entirely different from that of appellee. The principal differences are as follows: The association there was an ordinary corporation organized for pecuniary profit in which voting was allowed by the members on the basis of stock ownership instead of limiting each member to one vote as is done by appellee association. That association bought from and sold to both members and nonmembers; it operated an open market; both growers and non-growers were stockholders. The by-laws of the association provided that a stockholder should be penalized if he sold his produce to a competitor of the society. The difference between that

case and the case at bar was well stated by Iowa court in its opinion in that case, is this language:

"This society was something more than a mere selling agency. It not only acted as a seller, but also purchased, in the open market, from members and nonmembers, alike, save as heretofore stated. . . . *Of course, a mere selling agency is not a monopoly, and neither the common law nor the anti-trust statute applied to a genuine sales agency."* (Italics ours.)

*Ga. Fruit Exchange* v. *Turnipseed, supra,* was decided by an intermediate court of appeal of Alabama, therefore *Ex parte Baldwin County Producers' Ass'n, supra,* holding to the contrary, which was decided by the supreme court of Alabama, is controlling. *Cummings* v. *Union Blue Stone Co., supra,* involved a corporation which controlled ninety per cent. of all marketable Hudson blue stone. It was organized for the purpose of fixing prices. The court held that since the association was able to fix arbitrary and unreasonable prices it was illegal. *Pocahontas* v. *Powhatan Coal Co., supra,* involved a combination of twenty coke manufacturing corporations which had the exclusive power to fix prices and prescribe other essentials of the business. All competition with others engaged in the same business was destroyed. The court held the combination illegal. In *Whitridge* v. *Mt. Vernon Co.,* the contract considered was held void because a corporation holding a majority of the stock in a second corporation was making contracts for its own benefit between the second corporation and a third corporation in which it owned all the stock. This was held to be a violation of a trust relationship. The question of the restraint of trade was not involved nor discussed. *People* v. *Milk Exchange, supra,* involved a combination of milk distributors to fix the prices to the consuming public. Prices were actually fixed and the milk market of New York was controlled. The court said that the logical effect of so fixing the prices was to paralyze the production and limit the supply and

thus leave dealers in a position to control the market. *Ford* v. *Chicago Milk Ass'n, supra,* was organized as a price-fixing association without regard to market conditions and was held illegal. *Gay* v. *Brent,* 166 Ky. 833, 179 S. W. 1051, so much relied on by appellant, involved an agreement or understanding by which the parties to the contract sought to absolutely control the price of blue grass seed in Kentucky, which state produced ninety per cent. of the blue grass seed of the world. Clearly such a scheme was illegal.

It will be seen that this court in construing our statute prohibiting monopolies has applied the rule of reason, as has the supreme court of the United States in construing the federal statute against monopolies, as have also the courts of other states in passing on co-operative marketing contracts substantially the same as the one here involved. There must be an unreasonable or undue restraint of trade. It must be such a restraint of trade as is detrimental to the public interest. A statute will not be construed so as to lead to unreasonable or absurd results if that can be avoided. The legislature must be given credit, if the language of the statute in question will permit it, of legislating in the public interest. It is inconceivable that it was intended by our anti-trust statute to condemn any and all contracts between two or more persons which might have the effect to hinder the freedom of trade to the very smallest extent. Such a construction, as it will be seen at once, would lead to absurd results. It would destroy to a large extent the public welfare instead of promote it. The plan of appellee association considered in connection with the marketing and association contracts between appellee and its members does not undertake to fix prices of long staple cotton. The outstanding purpose is to promote intelligent warehousing and marketing of such cotton. Appellee association goes out in the open market and hunts purchasers who compete against each other. It is simply a sales agency or a plan

for group marketing. It is true it has large powers, but not even *all* the power at one end of the bargain. One of the main purposes is to prevent long staple cotton growers from being forced on account of their financial necessities to dump their cotton on the market during the three or four months of harvesting time. A steady market and a reasonable price are central ideas in the plan, a continuous market for the producer the year round, instead of for only three or four months. Another object is to save expense to the producer by means of having large quantities of long staple cotton stored, classed, and marketed by appellee association instead of by thousands of producers, who know nothing about classing cotton. Appellee association under the arrangement is able to sell direct to the mills as well as to others. Mississippi is almost exclusively an agricultural state. Its chief product for market has always been, and probably always will be, cotton. It would be hard to conceive of how a steady market and a reasonable and profitable price for cotton to the producers would be inimical to the public welfare in this state. On the contrary, it would appear that not only every cotton producer in the state would be benefited thereby, but also every other person engaged in any kind of business whatsoever.

Although the Co-operative Marketing Act (chapter 179, Laws of 1922) does not and could not declare what the public policy of the state was before its adoption, still it ought to be persuasive on the courts as to what was inimical to the public welfare at that time. It embodies the judgment of the legislature recently after the making of the contract involved. By it all such contracts for the future are declared legal; they are authorized in order to promote what the legislature thought was the public welfare. Was the public interest one thing in September, 1921, when this contract was made, and another thing in the early part of 1922, when this statute was passed? We think not.

Appellant contends that appellee must fail in this cause because there is no mutuality of the remedy between the parties; that appellee is not entitled to the remedies of specific performance, injunction, and liquidated damages for a breach of the contract in question by appellant because appellant would not under the law be entitled to like remedies in case of a breach of said contract by appellee. Without going into the question of how the law stood on this subject in its application to the case at bar prior to the adoption of the Co-operative Marketing Act, chapter 179, Laws of 1922, we find that by that act the exact remedy here adopted by appellee is provided for. In section 17 (b) and section 24 of said act, which sections are copied above in the statement of the case, it is expressly provided that any co-operative marketing association organized under the laws of any other state coming into this state, whose purposes and plans are substantially the same as those provided for in said act, shall be entitled to the remedies of liquidated damages, injunction, and specific performance. It is true that said Co-operative Marketing Act having been adopted after the contract here considered was entered into, does not and could not undertake to control the substantive rights of the parties to this cause. It is not true, however, that the remedies therein provided are not applicable to past as well as future transactions. It is too well settled to merit discussion that a remedy afforded by a statute passed subsequent to the date of the contract in question may be invoked by a party to the contract who has been wronged by its nonperformance. Such legislation does not impair the obligation of a contract. The obligation of a contract has reference alone to the rights of the parties arising thereunder and not to any remedy for their enforcement. A law creating a remedy applies to prior as well as future contracts and is constitutional. *McMillan* v. *Sprague,* 4 How. 647, 35 Am. Dec. 412; *Woods* v. *Buie,* 5 How. 285; *Coffman* v. *Bank of Kentucky,* 40 Miss. 29, 90 Am. Dec. 311.

Appellant contends further that the provisions in this contract stipulating for the payment of ten cents per pound by appellant to appellee on all cotton not delivered by the former to the latter as liquidated damages for the breach of said contract growing out of such failure to deliver is a penalty and not liquidated damages, and therefore is unenforceable. *Anaheim Citrus Fruit Ass'n* v. *Yoeman, supra; Burley Tobacco Ass'n* v. *Gillaspy, supra; Castorland* v. *Shantz, supra; Bullville Milk Ass'n* v. *Armstrong, supra; Ex parte Baldwin County Ass'n, supra*— all hold squarely to the contrary. The principles governing a determination of whether a stipulation in a contract provides for a penalty or liquidated damages are discussed in *Shields* v. *Earley* (Miss.), 95 So. 839, and *Jones* v. *Miss. Farms Co.,* 116 Miss. 295, 76 So. 888. On account of the difficulty of ascertaining anything like an accurate estimate of the damages which appellee association would suffer on account of a breach of contract by a member, a sum agreed upon, if reasonable, will be upheld as liquidated damages. The sum provided here by contract is ten cents per pound. It is a matter of common knowledge that staple cotton has fluctuated during one season as much as ten cents a pound. We are of opinion therefore that this ten cents per pound is what the contract says it is— liquidated damages—and is recoverable. We do not consider that any other of appellant's contentions is of sufficient seriousness to merit discussion.

*Affirmed.*