STANDARD OIL COMPANY OF KENTUCKY *v.* STATE EX REL. ATTORNEY-GENERAL.

[61 South. 981.]

1. MONOPOLIES. *Penalties. Pleading. Laws* 1908, *chapter* 119. *Statutory regulation. Constitutionality.*

Under Laws 1908, chapter 119, subdivision "N" providing that any corporation or person who shall attempt to destroy competition in the manufacture and sale of a commodity by offering it for sale at a lower price at one place in the state than in another, difference in freight rates and other necessary expendi-

tures considered shall be held to be a trust and a combine and under subdivision "O," providing that it shall be sufficient to make out a *prima facie* case of a violation of subdivision "N" to show an offer of sale of a commodity at a lower price at one place in the state than at another, or a violation of subdivision "O" to show a lower charge for service in one locality than another. Where a bill is filed in chancery to recover a penalty for a violation of this act, the pleader is not absolved from charging as a matter of fact that the sales alleged to have been made were so made for the purpose of destroying competition and its failure to do so makes the bill demurrable.

2. MONOPOLIES. *Statutory regulations. Laws* 1908, *chapter* 119. *Constitutionality.*

There is nothing in Laws 1908, chapter 119, which is in violation of the national or state Constitution.

APPEAL from the chancery court of Lauderdale county. HON. SAM WHITMAN, JR., Chancellor.

Suit by the state of Mississippi, on relation of the attorney-general, against the Standard Oil Company of Kentucky. From a judgment overruling a demurrer to the bill, the defendant appeals.

This suit was begun by a bill filed in the chancery court by the attorney-general in behalf of the state, against the Standard Oil Company of Kentucky, alleging a violation of chapter 119 of the Laws of 1908, which contains supplementary provisions to the anti-trust statute 'of the state, and claiming penalties of one million, six hundred and seventy-five thousand dollars for such alleged violation. The bill alleged that the defendant offered its products for sale in different places in the state on the same days at different prices, the difference in freight rates and other necessary expenditures considered, which action on the part of said defendant is in direct conflict with the provisions of the laws of the state, and which action upon the part of said corporation was unlawful, because in violation of the provisions of the law of 1908.

The bill alleged a violation in subdivisions "j," "k," "l," "m," "n," and "o" of said chapter 119. Subdi-

vision "n" is as follows: "Who shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by selling or offering the same for sale at a lower price at one place in this state than another, differences of freights and other expenses of selling and delivering considered," shall be held to be a trust and combine, etc.

The defendant filed a demurrer, which was addressed to that portion of the bill in which it is alleged that the selling or offering at different prices *is* a violation of subdivision "n." The demurrer was also addressed in general terms to the bill as a whole. The court overruled the demurrer, and granted an appeal to settle the question of law.

*Mayes & Mayes*, for appellant.

The demurrer before the court is so framed as to present the objections which we conceive to exist against the bill, considered under item "n" in two ways: First, as a special demurrer addressed to that portion of the bill in which it is alleged that such selling or offering at different places is a violation of item "n," and, secondly, as a general demurrer addressed to the bill as a whole.

These we conceive are simply variant ways of presenting what is essentially the same question; and that question we shall now proceed to discuss.

By way of preliminary we invite the court's careful attention to this statute, in order to fix clearly exactly what it is that the statute provides.

First: It will be seen that the statute makes no difference between parties charged. Its express provision is that "Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever," which shall do certain things, shall be considered as violating the trust laws. It is not, therefore, a question simply of the regulation of corporations created by authority of the state.

The intendment and the denunciation of the statute is leveled against natural persons in their private capacity; against partnerships, against domestic and foreign corporations alike. In this particular the provision of the statute is sweeping and unrestricted; it covers everybody.

Secondly: The court will note that the statute levels its denunciation against the selling or offering to sell at different prices "a commodity." That is the descriptive expression, and the only one, employed in the statute.

The law is violated, if any commodity be by the same person offered for sale at different points in the state, at different prices. It makes no difference how insignificant and trivial the commodity may be.

In this case it is petroleum and its products; but the statute applies just as well to "peanut Sam" peddling goobers in Jackson and Canton, as it applies to the Standard Oil Company of Kentucky selling petroleum.

Furthermore, as between commodities, the statute has no aspect or provision whatever in respect to the nature of the commodity, as to whether it is one effected by a public use or not. It is not like those statutes, where legislative interference with the sale has been justified on the ground that the commodity legislated about was of such nature as that the dealing in it affected the public health or morals; such as liquors, poisons, etc.

Neither is the statute one which deals with the regulation of the selling of articles of prime necessity (even if such regulation were admissible on that ground alone); and in the instant case, as a matter of fact, petroleum is no more a matter of prime necessity than are potatoes or pocket-knives; and any process of reasoning which would constitutionally justify or excuse legislative interference with the price of dealing in this commodity would also justify such interference with the price of dealing in those other commodities.

Neither is the statute based on the recognized right of the legislature, within certain limits, to fix, or con-

trol the fixation of, charges in business of such nature as that the business themselves are affected with a public use; such as the business of transportation; or the elevator business; or, in some states, the business of carrying on a public mill. This statute, whatever may be its dealing, deals with all sorts of business, in all sorts of commodities, and the sale of petroleum is no more a business affected with a public use than is the sale of dry goods or the sale of candy, or the sale of ordinary groceries.

Petroleum, it is true, is an article of common use, but it is no more common in its use than hundreds of other articles which nobody has ever claimed that the legislature could regulate the trading in, on the ground of prime necessity.

Nor is it a commodity that the public indispensably needs for its comfort. The writer of this brief distinctly remembers the date when he first saw a coal oil lamp, which was the first use of petroleum, and it was in the month of October, 1860. The world got along very well prior to that date.

Another thing in connection with this statute that remains to note: Item "n" provides that "if any person shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by selling or offering the same for sale at a lower price at one place in this state than another, difference of freights and other necessary expenses of sale and delivery considered," he or it shall be deemed and held to be a trust and combine, etc.

This statute permits different prices at different places, provided such difference in price can be explained and excused in one way; and that is by showing a corresponding difference of freights and other necessary expenses of sale and delivery. But how about a difference in production expenses? The statute prohibits attempting to destroy competition in manufacture as well

as attempting to destroy competition in sale. So far as competition in sale is concerned, it makes allowance for a difference in freights, and other necessary expenses of sale and delivery, but it makes no allowance whatever for difference in expense of manufacture. The result of which is this: That if a man owns two or three saw mills in the state of Mississippi, and one saw mill is located in the northern part of the state, while the other is located in the southern portion, and the stumpage around one saw mill has cost him one price while that used by the other mill has cost him a different price, he is still obliged under this statute to put the price on the product of both mills f. o. b. at the same figure or else be held subject to the trust and combine laws.

It is only a difference in the expense of sale which is allowed for, and yet the prohibition of the statute is leveled against competition in manufacturing as well as competition in sale.

Consider, again, exactly what this statute means: Take the ordinary mercantile business: Take, by way of illustration, the Kress stores; we will suppose that Kress has stores in Meridian, Jackson, Vicksburg, Natchez, Hattiesburg, and perhaps elsewhere in the state. What is the result? He is forbidden by this statute to make any little advertising article a leader on a particular day in any one of his stores unless at the same time in every store he has in the state, he makes a leader at the same price of that same article.

If he should undertake to sell two-year old rose bushes, potted, in Jackson at ten cents, on a certain day for an advertisement dodge, as is very common, under this statute he is obliged to do the same thing in every other store he has in the state, or be held to be a trust and combine, and subject to a penalty of five thousand dollars a day.

Illustrations might be multiplied, but they will suggest themselves to the mind of the court. We have indulged in the preceding analysis of this statute in order to de-

velop to the court our conception of what a crude and unthought out piece of legislation it is, by way of discussion of its constitutionality.

But that is not all. There is even a graver objection, if it is possible to have a graver one, and that is this: What this statute forbids is not that one shall destroy, or attempt to destroy competition in the manufacture or sale of a commodity; but it is that one shall attempt so to destroy manufacture or sale in one particular way. In order to come within the terms of the statute, such attempted destruction of competition, must be by selling or offering to sell at different prices.

Couple this item with item "m" which in similar manner prohibits an attempt so to destroy competition by selling at a price below the normal cost of production, and those two provisions exhaust the contents of the statute in this particular. Add them together, and the whole provision of the statute is a provision that if any person shall attempt to destroy competition, either by selling at a price below the normal cost of production, or by selling at different prices at the same time within the state— then he shall be held subject to the trust and combine laws; but *mentio unius, exclusio alterius est,* so far as the statute is concerned, he is left free to attempt to destroy competition by other processes, whatever processes they may be, and yet as to that, the statute has nothing to say to him.

Therefore, the statute is not only crude and ill-thought out in regard to its subject-matter, as we have pointed out above, but also it is defective and inapt in regard to its provision and definitions of the processes by which such attempted destruction is sought to be accomplished; and in its inclusion of two processes and its exclusion of all others. So much for the statute and its provisions. We now come to the constitutional question.

It is horn book law that the right to buy and sell property is one of those personal liberties which are guar-

anteed by the constitution both of the state and of the United States, and which are inherent and inalienable. Authority is not needed to this proposition, but yet see 8 Cyc., page 886, paragraph F.

We affirm, and we plant ourselves on the proposition, that this statute is unconstitutional, violating the fourteenth amendment to the Constitution of the United States, in that it undertakes to deprive citizens, whether individuals or corporations, and whether domestic corporations or foreign corporations, of their property without due process of law. It undertakes to deny to them the right to sell their property at such price as they may choose, and on such considerations as may appeal to them; and places them in such position that if they undertake to exercise the right so naturally appertaining to them and guaranteed by constitutional principle, they are subject to penalties ranging from twenty dollars to five thousand dollars per diem.

Let the court observe, the sole point in this statute is that the party assailed by the state is guilty of selling his property of similar sort at different prices within the limits of the state, with no allowance whatever for latitude, except that in the fixation of his price he may take into consideration the differences in freight and necessary expense of making the sale itself.

The fact that the property costs him more to produce in one part of the state than in another is made immaterial. The fact that in one portion of the state there is a better and brisker market for his property than in another, and therefore a trade exigency upon him to reduce prices in order to create a demand existing in one place which does not exist in another, is made immaterial. All of the various considerations which cluster about trade processes are made immaterial, except only the freight of the sale itself.

The party accused is deprived absolutely of the control of the prices of his own commodity. It makes no

difference how insignificant those commodities may be, or how far removed from any notion that they are affected with a public use.

We deny the right of the legislature to indulge in such arbitrary legislation. The court will further observe that in this statute, there is no element of conspiracy or combination. The trust law is not alleged to be violated on the ground that trade is restrained by suppressing competition through confederacies, conspiracies, combinations, etc.; but the sole content of the statute is that one man, plain John Smith, cannot sell his goods to suit himself without coming within the denunication of the statute.

The effort which has been made occasionally to justify legislation of this character, or to excuse it, is under the idea of the general welfare.

We were aware of the fact and have fully considered the fact, that there is a wide sweep to the police power. But the police power has its limits. The legislation which is embodied in this chapter is tyrannous, and trenches too far on individual liberty. It cannot be shielded by appealing to the notion of the public welfare. That phrase, and the notion for which it stands, is one of those convenient ambiguities under which, since the dawn of constitutional history, it has been found that the encroachments of tyranny on personal liberty cover themselves. Even "Imperial Caesar" in his destruction of the Roman republic invoked the phrase *salus populi,* and the Russian Czar calls himself, and he is called by his people, "Little Father."

It is for the courts to constitute the guardians of personal liberty in this country, and when the legislature sees proper, as sometimes it does do, to indulge in legislation like this, to declare it unconstitutional and void.

The ideas which we have endeavored to express above do not originate with us. They are fully expressed and clearly set fort in one or two cases which we shall now submit.

In *State* v. *Edwards*, 86 Me. 102, the supreme court of
that great state was considering the statute which lim-
ited the amount of toll which might be taken by a water
mill doing grinding for the public, and they held that
statute to be constitutional, but in so holding that great
supreme court recognized, and in the clearest terms set
forth, the very constitutional principles for which we are
contending: "If it be a public use, it is within the su-
pervision and control of the legislature. The trouble-
some question is whether the use be public. *Tyler* v.
*Beacher*, 44 Vt. 648, 8 Am. Rep. 398. In most branches
of business the public has an interest. That interest
varies, according to the surrounding conditions of the
particular business in question. If it be a monopoly, the
interest of the public to be fairly and conveniently served
is much greater than when the monopoly ends by force
of wholesome competition. A distinction must be made
between a public use and a use within the function of
government, to establish and maintain. In the latter
case, it is private enterprise that serves the public, and
in which it is interested to the extent of its necessities
and convenience. The former is clearly within the con-
trol of the legislature, while the latter may not be. Many
authorities, however, go to that extent. *Munn* v. *Illi-
nois*, 94 U. S. 113, 24 L. Ed. 77; *Budd* v. *New York*, 143
U. S. 317; 36 L. Ed. 247, and cases cited. The public is
interested to be well and reaosnably served at the store
of the tradesman, the shop of the mechanic, and the office
of the professional man, and yet all these vocations are
private  The goods on sale in the store, material fur-
nished by the mechanic, and the skill employed by the
professional man are the individual property of each
one, respectively. Their vocations are exercised for their
own gain, and they have a right to the fruits of their
own industry, without legislative control. It must not be
understood that each one may not properly be subjected
to suitable police regulations as to the manner of his

business (2 Kent., Com. 340), but the business cannot be thereby controlled, and the profits to be gained therefrom destroyed, taken away, or limited by the establishment of prices; otherwise, we should paternal government that might crush out all individual liberty, and the declaration of our constitution would become as valueless as stubble.''

Furthermore, we refer the court for a full and instructive consideration of this topic in *People* v. *Gillson*, 109 N. Y., 389, in which the supreme court of that state, speaking by Mr. Justice Peckham, held to be unconstitutional and void a state statute passed in the interest of the fight that was being made against lotteries, which statute provided that if any person sells, exchanges or disposes of any article of food and offered to give some other article as a gift, prize or premium to the purchaser, it was a misdemeanor.

Under this statute a party was indicted and the supreme court of that state held that such statute was void as an infringement of the personal liberty of sale and fixation of price, in a case where the party accused had sold two pounds of coffee and in connection therewith, had given a cup and saucer. Clearly forbidden by the statute, but the statute was void.

So we insist here that the legislature of Mississippi in a case in which there is no pretense made that the property was a property of prime necessity, or that the business in which the sale was made was one affected with a public use; or that the property sold was of such nature as to affect the public health or morals, or that there was any combination, confederacy, or conspiracy, has any right to declare that the bare fact of selling at a different price in one part of the state, is an effort to abolish competition within contemplation of the trust and combine laws, and thereafter to subject the seller to liability for a penalty of five thousand dollars per day.

In conclusion, we beg the court to observe what may, and will, in many cases, be the logical effect of this stat-

ute.  On its face it purports to be a statute encouraging
and preserving competition; yet in its practical working
it is a statute which can be availed of, and will work out
in many instances, the direct reverse, and suppress com-
petition.

This seems a somewhat startling proposition, but it is
true.  Take, for instance, the case of the Standard Oil
Company, which does business throughout the state of
Mississippi.  We will say, for illustration, that it has a
depot in the town of Woodville, the extreme southwest-
ern corner of the state; we will say at that depot it sells
oil at ten cents per gallon.  We will say that the Texas
Oil Company saw proper to establish a depot in Wood-
ville, and because of the fact that its cost of production
and transportation justifies it in so doing, it fixes the
price of its oil at Woodville at $9\frac{1}{2}$ cents.  The effect of
this statute is to forbid that the Standard Oil Company
shall endeavor to meet that price unless at the time when
it puts its oil in Woodville down to $9\frac{1}{2}$ cents, it puts its
oil all over the state of Mississippi down to $9\frac{1}{2}$ cents.

Result: The Standard Oil Company in such case would
have to reduce its prices over the entire state, or would
have to abandon the Woodville market wholly to the
Texas Company and concede to it a monopoly.

We give the foregoing as an illustration, but it is
quite on the cards that it may be worked in any case.

The court will note that the seller is not allowed to
reduce his price in one market in order to meet compe-
tition at that market, but barring the question of the
expense of sale only, including freights, he is bound in
every market in the state, without respect to the question
of competition, to sell at the same price.

The court will observe, further, the extraordinary ef-
fect of this statute.  It assumes as its whole basis that
the sale at two prices (excluding the element of freights
and expense of sale) at different points in the state it-
self constitutes an attempt to suppress competition.  The

104 Miss. 57

statute is so construed, and is so insisted on in the bill filed by the attorney-general. The bill alleged that such sales were made at differing prices, and alleges that that fact constitutes an attempt to suppress competition.

This being true, then amongst the other anomalous results of this statute fatally trenching on liberty, is the absolute denial of the right of any person or corporation engaged in merchandise to attempt to open up new fields for commerce, or to introduce its commodities into new channels, by making a reduced price even for the time being, in order so to introduce a new line of trade. This practice has obtained in commercial circles from time immemorial and the propriety of it has received recognition in the courts and in this court, and yet this statute says no, that there shall be no making of different prices except in so far as those differences are to be accounted for by the difference in freight rate and the expense of selling; that no other considerations are to be allowed, under penalty of the law.

The court will note that the bill in this case alleged that the Standard Oil Company of Kentucky at the time when it is charged to have been guilty of the violation of the statute was, as a fact, engaged in competition with hundreds of dealers.

For the foregoing reasons, we submit that this statute is unconstitutional and violative of the fourteenth amendment to the Constitution of the United States, and that the decree of the court below should be reversed and the bill dismissed.

*Ross A. Collins,* attorney-general, for appellee, filed an elaborate brief too long for publication.

COOK, J., delivered the opinion of the court.

As we construe the bill of complaint in this case, it is evident that the pleader proceeded upon the theory that subdivisions "n" and "o" of section 1 of chapter 119 of

the Laws of 1908, taken in connection with the rule of evidence prescribed by the same section, rendered the doing, or the attempting to do, the things denounced by the subdivisions "n" and "o" *ipso facto* violations of the law. The rule of evidence is written this way: "And it shall be sufficient to make out a *prima facie* case of a violation of subdivision 'n' hereof to show a sale, or offer of sale, of a commodity at a lower price at one place in this state than another; or a violation of subdivision 'o' to show a lower charge for the services therein mentioned in one locality than another."

The rule of evidence is not a rule of pleading. It simply means that, when it is shown by the evidence that defendant has done or attempted to do the things denounced, it will be presumed that the act was done with the purpose or intention of destroying competition, and it would then be incumbent upon the defendant to show that the acts, if performed at all, were not designed to accomplish the purpose prohibited by the statute. But this rule of evidence does not absolve the pleader from charging, as a matter of fact, that the sales alleged to have been made were so made for the purpose of destroying competition. The bill does not so charge, and the demurrer should have been sustained.

As this case must be reversed so that the pleadings may be amended, if the state desires to amend, we think it is proper, if not imperative, that we give the parties to this controversy our construction of the "anti-trust law" of this state, found in chapter 119 of the Laws of 1908. Subdivisions "j," "k," "l," and "m" are directed generally at "restraint of the freedom of trade or production," monopoly of trade, engrossing or forestalling any commodity, and the destroying of competition by selling at a price below the normal cost of production. Then come subdivisions "n" and "o," which denounce efforts to destroy competition in the manufacture or sale of a commodity, by selling or offering same for sale at

one place cheaper than at other places, and destroying competition by the rendering of service, or by manipulating, handling, or storing any commodity for a less price at one place than at other places, taking into consideration the difference of freights and other necessary expenses.

The proof of any person, or corporation, having done the things denounced in subdivisions "n" and "o," will make out a *prima facie* case against the person or corporation charged with violating these sections, and subject them to the penalties prescribed by the statute. The *prima facie* rule of evidence is in terms limited to subdivisions "n" and "o," and has no application to any other subdivision of chapter 119.

We are unable to see anything in this statute which is in violation of the national or state Constitution. We think the statute denounces all restraints of the freedom of trade, and is broad enough to cover every and all kinds of business dealings inimical to the general welfare of the people of the state. The subdivisions "n" and "o" so severely criticised here specify a common device resorted to by powerful financial combinations to temporarily destroy competition, and then to monopolize the business and recoup for former losses by later extortions.

No calamity or injustice will follow the enforcement of the law, and if appellant has any defenses they are not barred by the statute. It will be easy to show that any legitimate reduction of prices was not made to destroy competition and create a monopoly, but in response to local conditions, or any other reasonable business policy. The purpose of the reduction of prices is the real test, and the *prima facie* case cannot disturb law-abiding defendants in possession of all the facts controlling seemingly unlawful acts. Only those who have willfully and knowingly violated the law, and who have earned the pains and penalties prescribed by law, need fear the test of explaining their acts.

For the reason that the bill of complaint does not charge that defendant reduced prices to destroy competition, and thereby create a monopoly, the decree of the lower court is reversed, and the cause is remanded, with leave to the complainant to amend the bill within thirty days from the filing of the mandate in the lower court.

*Reversed and remanded.*