STATE *ex rel.* JORDAN, DIST. ATTY., *v.* GILMER GROCERY CO.

(Division A.   Jan. 13, 1930.)

[125 So. 710.   No. 27805.]

Shands, Elmore & Causey, of Cleveland, for the state,

Forrest G. Cooper, of Indianola, for appellee.

Watkins, Watkins & Eager, of Jackson, for appellee.

104

Argued orally by **H. H. Elmore**, for appellant, and by **Forrest G. Cooper**, and **W. H. Watkins**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

From an adverse judgment rendered by the circuit court of Sunflower county, the state appeals to this court.

On the relation of its district attorney the state filed its declaration against the Gilmer Grocery Company, alleging, substantially in the terms of the statute, a violation thereof by the appellee, and sought recovery of the penalties therein prescribed, chapter 305, Laws 1928, being the one upon which the suit is based. .

In substance, the declaration charged that Gilmer Grocery Company, a Mississippi corporation, on August 28, 1928, was a chain operator of cotton gins, and prior thereto had operated and is now "operating gins in more than two places within the state," and specified that it operated gins at Indianola in Sunflower county, and likewise at Itta Bena and other places in the state; and that it did then, and theretofore, buy cotton seed at its said gins in connection with its gin business.

It was further alleged that the Gilmer Grocery Company on that date unlawfully discriminated in prices paid for cotton seed, in that it bought the seed from five bales of cotton at its gin located at Itta Bena for forty-five dollars per ton, "which price was then and there far in excess of the market price;" on the same day it purchased large quantities of cotton seed at its gin at Indianola and other places, paying therefor thir-

ty-seven dollars per ton, and averred that the necessary operating expenses, freight rates, and other elements affecting the price thereof at Indianola and at other gins were not different from the conditions in this behalf existing at Itta Bena, and that no difference existed warranting the payment of such excess in price at Itta Bena.

The declaration further averred: "And plaintiff avers that the said defendant thereby attempted to destroy competition in its gin business including the business of purchasing the seed at Itta Bena, Mississippi, and that the effect of said discrimination would be to destroy competition in said business at Itta Bena, Mississippi, and plaintiff avers that there were other persons and other cotton gins at Itta Bena on said day engaged in the business of operating cotton gins and buying seed on said day at Itta Bena, and plaintiff further avers that the said higher price paid for cotton seed at Itta Bena was not paid in meeting legitimate competition, but pursuant to defendant's usual method and scheme to destroy and to attempt to destroy competition at places and in the territory where defendant operates its chain of cotton gins; and said defendant on said day ginned five bales of cotton at its Itta Bena gin in pursuance of said discriminatory practices."

Appellant demanded judgment for the statutory penalty provided in said chapter 305, Laws of 1928, in the sum of one hundred dollars per bale, or five hundred dollars.

The only defense by pleading offered by appellee now before us is its special plea No. 1, which we set forth in hæc verba:

"Now comes Gilmer Grocery Company, a corporation, by its attorney, in this its special plea and says that the plaintiff ought not to have or maintain its aforesaid action against it because it says that at the time of the passage and approval of chapter 305 of the laws enacted at the regular 1928 session of the Mississippi leg-

islature, and at the time of the purchase of the seed from five bales of cotton at dissimilar prices, as charged in the declaration, there were in Mississippi about one thousand four hundred active cotton gins, which were engaged in the business of the purchase of cotton seed; and there were also forty-eight cotton oil mills in Mississippi engaged in the business of buying cotton seed at two or more places in this state; and there were other seed buyers which bought seed at two or more places within the state; and there are nonresident cotton oil mills which buy cotton seed at two or more places within the state of Mississippi; and that chain operators of cotton gins existing at the time of the passage of said act, and at all times laid in the declaration, purchased the seed from not exceeding seventy-five thousand bales of cotton, whereas, the total production of cotton for the year 1927 within the state of Mississippi was one million three hundred forty-six thousand bales; and that estimated production of cotton for the year 1928 is in excess of one million one hundred thousand bales.

"Defendant further says that in the Town of Indianola, and within a radius of four miles there were in the 1927 season and are now seven cotton gins which ginned in 1927 a total of fifteen thousand and fifty-two bales of cotton; and of that amount the gin of this defendant ginned two thousand six hundred and seventy-five bales, and purchased the cotton seed from all of this cotton except that which was saved; and that the other gins in Indianola purchased the seed from all of the cotton ginned by them except the seed saved, which seed saved was only a small fraction of the total tonnage delivered; that Indianola is in Sunflower county, Mississippi, which has seventy-one active gins.

"Defendant further says that within the trade radius of Indianola are several other cotton gins, which, in the 1927 season and at the present season, are engaged in the purchase of cotton seed.

"Defendant further says that in the town of Itta Bena and within a radius of two miles there are located five cotton gins, all engaged in the purchase of seed there ginned, and during the 1927 season ginned a total of eight thousand three hundred and ninety-six bales, whereas, the gin of defendant ginned a total of two thousand two hundred and eighty bales. There are also several other gins within a radius of seven miles of Itta Bena, which buy cotton seed; that Itta Bena is in Leflore county which has sixty-two active gins.

"Defendant further says that it has been a chain operator of cotton gins for a period of at least eight years and during that time no competitor of the Gilmer Grocery Company has been put out of business by the competition of defendant.

"Defendant further says that it is impossible at the time of purchasing cotton seed to foretell the exact quality or price of seed when sold as the purchasers from the cotton gins make prices dependent upon the quality shown by analysis at the time of actual delivery, which analysis is made at or after delivery.

"Defendant further says that the price of seed is linked inseparably with the volume of bales ginned, and the overhead expenses of operation are dependent largely upon the total volume to be handled, except by guessing at the volume handled the preceding season; that the cost per bale of ginning is also dependent upon the volume of ginning done in a season.

"Defendant further says that it has no way of accurately meeting that kind of competition which obtains volume of ginning by making profit sharing promises on seed handled, or by offering and paying rebates to planters and others who induce their tenants, and others to take their ginning to these competitors, or who might resort to other methods of obtaining ginning from which there is no accurate way of determining the extent or value of inducement except to raise the price for cotton seed in the locality where such competition

exists, and if it does raise the price at such point it subjects itself to prima-facie guilt under said chapter 305, if in meeting indeterminate raise by competitor it honestly raises the price higher than the competitor has done.

"Defendant further says that there are only two or three chain operators of cotton gins within the state of Mississippi, and the combined purchase of seed by said chain operators is only a small proportion of the amount of seed purchased in the state; and that said chain operators of cotton gins are not separately or collectively a monopoly either in the state or in any community.

"Defendant further says that chapter 305 of the said 1928 laws is unconstitutional in that it provides that a prima-facie case of guilt and liability is made out by merely showing dissimilar prices paid for seed at two points; in that it is a special law which does not apply to all of the same class; in that it is an unwarranted and arbitrary infringement upon the freedom of contract; in that it is an unwarranted and arbitrary exercise of the police power of the state; in that it exceeds and goes beyond the police power of the state; in that it deprives the defendant of its property and liberty of contract without due process of law; in that it denies to the defendant the equal protection of the laws; in that the chain operators of cotton gins do not constitute that class of its citizens which can lawfully be singled out for limitation without including all other chain operators engaged in the purchase or sale of agricultural products and other necessities; in that it is in conflict with the Fifth and Fourteenth Amendments to the Constitution of the United States, and also in conflict with sections 14 and 87 of the Constitution of Mississippi, and in that it provides for the conviction of a crime of a citizen by the prima-facie showing of what might be either a lawful or unlawful act and places the presumption of guilt on the defendant for the doing of what might be a lawful act and places the burden of

proof on the defendant of guilt in conflict with the Constitutions of the United States and of Mississippi.

"And this the defendant is ready to verify."

To this plea appellant demurred as follows:

"1. The said special plea denies no material allegation of the declaration nor does it set up or aver any new matter of fact or facts sufficient in law to avoid said declaration.

"2. Said plea sets up no defense in matter of fact or law to said declaration."

This demurrer was overruled by the court, and appellant declining to plead further, the court dismissed this cause.

Section 1, chapter 305, Laws of 1928, including title, is as follows:

"An Act to forbid certain unlawful combinations of cotton ginners in restraint of trade; to affix penalties therefor; and to provide for procedure in such cases.

"Section 1. Be it enacted by the legislature of the state of Mississippi, That it shall be unlawful for chain operators of cotton gins operating gins in two or more places within the state of Mississippi, to discriminate in prices paid for cotton seed or in the prices charged for ginning services; the necessary operating expenses, freight rates, and other proper elements affecting prices being considered and the effect of which would be to destroy or attempt to destroy competition at either or any of said places in which said gins shall be operated. Provided, however, that a reduction in the charge for the service herein mentioned made in any locality for the purpose of meeting legitimate competition, or a higher price paid for seed in any locality, when such higher price is paid in meeting legitimate competition, shall not constitute a violation of this act. And it shall be sufficient to make out a prima-facie case of a violation to show a lower charge for the service herein mentioned in one locality than another, or to show a higher price paid for said seed in one locality than another, differ-

ences of freight and other necessary expenses of operating business considered.''

Section 2 provides that upon conviction the defendant shall be fined one hunderd dollars per bale for the first five bales, and ten dollars for each successive bale so ginned in violation of the statute.

Section 3 provides that private individuals or corporations may recover as liquidated damages, if damaged thereby; but this phase is not involved in this cause.

It is the appellant's position here that the declaration conforms to the statute which it sought to enforce; that nothing contained in the plea contradicts the substantial allegations of it; that nothing in the plea tenders an issue of fact presented by the declaration; and that therefore the sole question presented to this court is whether or not this statute violates the federal or state Constitutions.

Appellee asserts that chapter 305, Laws of 1928, violates the Fourteenth Amendment to the Constitution of the United States, in that it deprives the appellee of the equal protection of the law, and, considering the plea, the classification by the legislature is unreasonable and arbitrary. It is further insisted that the Fourteenth Amendment is violated, in that a prima-facie presumption of guilt is arbitrarily created. There are other minor questions which will be noted. In our opinion the declaration states facts which, undenied, make out a case, if the statute is valid; it charges that certain acts were done in an effort to destroy legitimate competition; it charges that there was no legal reason for the difference paid in price for cotton seed at the given points, and we think the language used in the declaration has been approved by this court in Standard Oil Co. v. State, 104 Miss. 886, 61 So. 981, where the court held that, in addition to charging a fact that a sale had been made at a lower price in one place than another, etc., the declaration should go further and say that the alleged sale had been so made for the purpose of destroying compe-

tition. The language of these two statutes is identical on this point.

An analysis of the plea discloses that the pleader, who is assumed to have stated every fact as strongly as he could for his position, nowhere denied the difference in the purchase price of cotton seed; nowhere denied that he was a chain owner of more than two gins operated in the state of Mississippi; nowhere denied that he was purchasing cotton seed as a chain gin owner at two or more of his gins; nowhere denied that he ginned the cotton and purchased the seed as alleged; nowhere denied that the difference in price paid was as stated in the declaration; nowhere denied that his motive was to destroy legitimate competition, considering the difference in freight rates, location, etc. The appellee seeks to have us say that his allegations with reference to unfair practices constitute a denial; they do not so specifically state, nor can that construction be deduced from the language used; it seems merely to have been thrown in as a possibility with which they might contend in meeting competition, but they did not allege that they had encountered this unfair practice, such as rebates, etc.

Appellee takes the position, which is admitted by appellant's demurrer thereto, that chain gin operators do a small business compared to the vast volume of cotton seed and cotton ginning business in Mississippi. To put it baldly, the plea undertakes to say that because the alleged trust is so small, weak, and puny, the legislature had no right to arbitrarily classify that business as a menace to competition. If the statute be constitutional, then the legislature may anticipate an evil to the public welfare and pass statutes to fend against the supposed wrong which is in process of accomplishment, and need not wait until the evil has predominated. Mr. Justice LAMAR said in Murphy v. California, 225 U. S. 623, 32 S. Ct. 697, 698, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153: "The regulation or prohibition need not be postponed until the evil has become flagrant."

On the proposition as to whether the classification enacted by the legislature in this statute is unreasonable and arbitrary, we think it best to give our construction of the intent and purpose of the act as deduced therefrom by us. At the outset we will say that counsel for appellee base their whole argument upon the proposition that the statute is aimed at cotton seed buyers rather than cotton ginners, and in this, having planted their whole argument upon the stated proposition, we think that much of their argument must fall of its own weight because of this interpretation placed upon the statute by them. The legislation is aimed at a chain operator of cotton gins in two or more places within the state, and denounces discriminations by such operator in the price paid for cotton seed, or in the price charged for ginning services, the necessary operating expenses, locality, etc., being considered; and states that the effect of such discrimination must be to destroy, or to attempt to destroy, competition in one or more of the places where said gins are operated, and this effect must be the motivating purpose of said operator; and that there may be differences in price for the purpose of meeting legitimate competition. We are clearly of opinion that the act seeks to prohibit unfair competition where said chain gins shall be operated. The difference in ginning prices, or a difference in the price paid for seed, are factors of equal force in their effect upon the ginning of cotton. The penalty is based on the number of bales of cotton ginned in furtherance of the policy of destroying competition by practices denounced by the act. It forbids obtaining ginning by discriminatory prices paid for cotton seed, or received for ginning; if no ginning is obtained by the chain operator because of his unfair competition, then no punishment could be inflicted. The thing at which the legislative mind was directed, as reflected by this act, was to prevent the gin operator from obtaining ginning by discriminatory practices. In considering whether or not the statute here

under consideration violates the equality clause of the Federal Constitution, it is well to state certain general principles which are applicable, and then the case made must be applied to these principles.

Our own court is committed to the proposition that a statute should be so construed as to render it constitutional, if possible, and a statute will not be declared invalid unless it is clearly apparent that it conflicts with the organic law after resolving all doubts in favor of its validity. See Richards v. City Lumber Co., 101 Miss. 678, 57 So. 977; University of Miss. v. Waugh, 105 Miss. 623, 62 So. 827, L. R. A. 1915D, 588, Ann. Cas. 1916E, 522; Miller v. State, 130 Miss. 564, 94 So. 706. Unfortunately we have this case before us without any development of the social and economic conditions which prevail with reference to the cotton growing and ginning situation. In other words, the case is here on demurrer, and it is never quite so satisfactory in passing upon the constitutionality of a statute to be compelled to do so without a full development of the entire situation, and local conditions, and the general trend of operation of the particular activity sought to be regulated, prohibited, or corrected.

In the case of Rast, Tax Collector, v. Van Deman, 240 U. S. 342, 36 S. Ct. 370, 374, 60 L. Ed. 679, L. R. A. 1917A 421, Ann. Cas. 1917B, 455, the supreme court of the land said:

"It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160. It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety. . . .

"It is the duty and function of the legislature to discern and correct evils, and by evils we do not mean some definite injury, but obstacles to a greater public welfare. . . . And, we repeat, 'it may make discriminations if founded on distinctions that we cannot pronounce unreasonable and purely arbitrary.' "

In the case of Clark v. Kansas City, 176 U. S. 114, 20 S. Ct. 284, 44 L. Ed. 392, on this question the court said that the state had the power to classify objects of legislation; that the rule of the Constitution left to the discretion and wisdom of the state a wide latitude as far as interference by the court was concerned; that it was not a substitute for municipal law; that the power was not invested in the court to correct the impolicy and injustice of state laws, and the equality it prescribed is not for persons merely as such, but according to their relations.

In the case of Missouri, K. & T. R. Co. of Texas v. Cade, 233 U. S. 642, 34 S. Ct. 678, 680, 58 L. Ed. 1135, the supreme court of the United States said: "The Fourteenth Amendment does not require that state laws shall be perfect; and we cannot judicially denounce this act as based upon arbitrary distinctions, in view of the wide discretion that must necessarily reside in a state legislature about resorting to classification when establishing regulations, for the welfare of those for whom they legislate."

In the case of South Carolina v. McMaster, 237 U. S. 63, 35 S. Ct. 504, 507, 59 L. Ed. 839, we find this language: "It has always been held consistent with this general requirement to permit the states to classify the subjects of legislation, and make differences of regulation where substantial differences of condition exist."

It is strongly to be presumed that the legislature of this state understands and appreciates the needs of the people, and that its laws are aimed at conditions understood by them, experienced by them, and that when they make discriminations in classification they are based

upon adequate grounds. This clause of the Constitution does not demand that state laws shall cover the entire field in a single law. See Rosenthal v. New York, 226 U. S. 260, 33 S. Ct. 27, 57 L. Ed. 212.

The statute does not violate the equal protection clause merely because it is not all-embracing. See Zucht v. King, 260 U. S. 174, 43 S. Ct. 24, 67 L. Ed. 194.

From Whitney v. California, 274 U. S. 357, 47 S. Ct. 641, 646, 71 L. Ed. 1095, we quote: "The statute must be presumed to be aimed at an evil where experience shows it to be most felt, and to be deemed by the legislature coextensive with the practical need; and is not to be overthrown merely because other instances may be suggested to which also it might have been applied; that being a matter for the legislature to determine unless the case is very clear. (Authorities.) And it is not open to objection unless the classification is so lacking in any adequate or reasonable basis as to preclude the assumption that it was made in the exercise of the legislative judgment and discretion."

A classification is valid wherever it proceeds upon any difference which has a reasonable relation to the object sought to be accomplished, and the difference does not have to be marked but must be palpably arbitrary. The statute may be crude, impolitic, or even unjust, and the classification may be according to general considerations and have reference to prevailing conditions. See Atchison, T. & S. F. R. Co. v. Matthews, 174 U. S. 96, 19 S. Ct. 609, 43 L. Ed. 909; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; Orient Ins. Co. v. Daggs, 172 U. S. 557, 19 S. Ct. 281, 43 L. Ed. 552; Heath v. Worst, 207 U. S. 338, 28 S. Ct. 114, 52 L. Ed. 236; Mutual Loan Co. v. Martell, 222 U. S. 225, 32 S. Ct. 74, 56 L. Ed. 175, Ann. Cas. 1913B, 529.

These general statements have been frequently recognized and applied by our own court.

We take judicial notice of the fact that cotton raising is the principal industry in this state of ours; that many millions of dollars are paid for the cotton raised by the people of the state; that the seed, when separated from the cotton, has become very valuable in these later years; that the oil together with the many by-products bring millions of dollars into this state; that most of the counties of this state are agricultural; and that it is too true that there is not a balance of industrial projects within our borders, most of our population are directly affected by this great agricultural pursuit of cotton raising. It is essential that this cotton be ginned; by the ginning operation the seed are removed from the fleecy staple, and the staple packed in compact bales and put upon the marts of the world. The tenant class of Mississippi, and the small individual farmers, in the aggregate constitute a great number of people whose lives, living, morals, welfare, and existence are dependent upon this one product, and cotton seed have come to be that in which this class of original producers are most interested. It is necessary that the cotton be transported from the farms to the gins in order to have this separating process completed. The ginner is in the most advantageous position to purchase the seed, because the laborer would have to add to his already burdensome occupation by transporting the seed to some other market. It is recognized in this state that if one desires to find cotton seed in quantities, the most appropriate place is the cotton gin. The tenant cotton producer, and small independent farmer on a per diem scheme, receive less wages in raising successfully a crop of cotton than almost any other class of laborer in these United States. This class, of necessity and of convenience, and sometimes because of shiftless want of thrift and industry, sell to the first buyer who will pay the money, and the ginner is the most convenient purchaser.

The classification here as to gin operators divides them into two classes—those who operate gins in but one

place, and those who operate gins in two or more places. Applied to these principles, it cannot be safely said that the legislature was arbitrary and discriminatory in undertaking to protect a majority of the citizenry of the state engaged in agricultural pursuit who have not a place to gin their cotton, which ginning must be done in order to put the cotton upon the market. It enacted this law to prevent unlawful competition and discrimination and eventually an advance to an oppressive degree in the price of ginning. We do not think the chain gin operator in the operation of the gin is so directly in competition with the oil mills, or with the cotton seed buyer, so far as it affects the public welfare, as he is with the independent ginner; and, of course, the legislature assumed and presumed that if allowed to pursue the policy denounced by it, the chain operators would become masters of the cotton industry in the state, a thing which the legislature thought to be evil, and which the legislature of Mississippi has had in mind several years. In 1914 it passed a statute (Laws 1914, c. 162) which prohibited cotton seed oil mills from owning a gin at any other place save at the domicile of the oil mill, and it has for many years had a statute which required gin owners to receive and gin cotton on the principle of "first come, first serve," and to that extent regulated it as it has regulated grist mills. Section 6546, Hemingway's 1927 Code, section 3294, Code of 1906. See State v. Crescent Cotton Oil Co., 116 Miss. 398, 77 So. 185. We cite this case to show the policy of the legislature. It is true that in other particulars so-called iniquitous trusts which were denounced some years ago are now regarded by the legislative department of the various state governments as being not so evil, and, because of policies pursued by corporate aggregations towards the public, there has been a decided shift of sentiment which is well-known to all students of our economic and social conditions; but, notwithstanding the fact that the legislature of the state of Mississippi has pursued a policy

which sought to protect the cotton growers from a combination which might depress the industry, it has passed laws permitting organizations of cotton growers to become associations for marketing purposes.

The legislature, judging by the act itself, had in mind that a chain operator of gins in two or more places was in competition only with the independent operator of gins, and that the independent cotton seed buyer and the oil mills engaged in the purchase of cotton seed, as well as the independent ginner, could not be included in the class by the alternative course of raising or lowering the price of cotton seed, or raising or lowering the price of ginning, for the reason that these were not competitive gin operators. If it were considered only from the standpoint of the purchaser of cotton seed, there might be basis for the argument of the appellee; but, as we have heretofore determined, the purpose of the act was to prevent unfair competition in the business of ginning cotton. Neither of these classes mentioned in the plea have it in their power to put up the price of ginning at one place in order to recoup losses at another; neither of them have the facility to put up the price of cotton seed at one place and recoup by raising the price of ginning at another; so, the classification appears to be a reasonable one when looking to the purpose sought to be attained by the legislature.

The cases of McFarland v. American Sugar Refining Co., 241 U. S. 79, 36 S. Ct. 498, 60 L. Ed. 899, and Fairmont Creamery Co. v. State of Minnesota, 274 U. S. 1, 47 S. Ct. 506, 507, 71 L. Ed. 893, 52 A. L. R. 163, call for comment from us. In the Sugar Refining case a statute of Louisiana sought to penalize any person engaged in the business of refining sugar who systematically paid less in Louisiana for sugar than was paid in any other state. Many other provisions and presumptions were there invoked. The answer of the refining company discloses that it was paying normal prices considering differences in location, freight rates, and those other important

things which enter into the prices of commodities. These important equations in determining whether or not such a classification was unreasonable and arbitrary were entirely omitted from the statute. Judge HOLMES as the organ of the court said that the statute bristled with severities; that if it was not directly aimed at the sugar corporation, at least it was arbitrary beyond possible justice; and that the presumptions and special powers created against it could have no foundation save the intent to destroy. He pointed out that a powerful rival who did no refining in the state could systematically pay a smaller price for sugar than was paid by the competitor who had a refinery within the state, and who was sought to be subjected to the penalties of the statute.

In the latter case the state of Minnesota had a statute as to the purchase of milk and cream very similar to ours. This statute had been in force for many years before this case arose; but just before the institution of this suit the state had passed an act which omitted any reference to the difference in locality, and legitimate competition, and this amended statute did not contain the language, either in form or substance, that the denounced act must be with intent to destroy competition. The omission of motive in the statute was the basis of the court's opinion as we see it, and is demonstrated, we think, by this language of the court:

"Counsel for the state concede that the statute requires buyers to pay the same price for like commodities at all points of purchase, after proper allowances for transportation; also, that it inhibits plaintiff in error from meeting local competition by increasing the price only at that place; also, from varying purchase prices to meet normal trade conditions. . . .

"As the inhibition of the statute applies irrespective of motive, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts, long regarded, not only as essential to the freedom of trade and commerce, but also as beneficial to the public. Buy-

ers in competitive markets must accommodate their bids to prices offered by others, and the payment of different prices at different places is the ordinary consequent. Enforcement of the statute would amount to fixing the price at which plaintiff in error may buy, since one purchase would establish this for all points, without regard to ordinary trade conditions.''

As we see it, there is such marked difference between the statute here under review and those statutes reviewed by the supreme court of the United States in the two cases as to make discussion or argument unnecessary. In the statute before us the motive is the gist of the offense, while in the statute reviewed by the supreme court of the United States the motive was not even a necessary ingredient of the offense. The normal trade conditions were ignored, and both of the statutes were, in effect, price-fixing statutes from which the alleged offender had no escape.

In the case before us, as we take it, the plea in nowise advances the idea that the disparity in prices paid at Itta Bena and Indianola was to meet legitimate competition. The only contended denial in the plea that the Gilmer Grocery Company's intention was to destroy legitimate competition is the statement thrown in that they had been in business for eight years and had not put any competitor out of business. This is not a denial of the material allegation of the declaration that the higher price paid was far in excess of the market price. The intention to destroy competition may have existed and may have been persistently pursued, as alleged in the declaration, but owing to other circumstances the purpose may have failed. The skill with which the purpose is carried into execution is not the thing to which the legislature sought to direct its attention; and if a person or corporation entertains the purpose to do wrong and performs such acts as reasonably indicate the purpose, then it is denounced by the statute. Success in the wrongful act is not the standard by which the appellee is to be judged.

In our opinion it is unnecessary to take up all the multitude of authorities cited here, as we have called attention to the strongest cases presented. A statute very similar in its language was reviewed in State v. Central Lumber Co., 24 S. D. 136, 123 N. W. 504, 509, 42 L. R. A. (N. S.) 804, which describes the situation we have before us in this language, speaking of a person seeking a monopoly: "He puts the price of the commodity handled so low, at the point where his victim is in business, as to make it impossible to meet such price except at a loss, and, to offset what loss he suffers at that point, he raises prices at one or more other points."

This same case was before the supreme court and is reported in 226 U. S. 157, 33 S. Ct. 66, 57 L. Ed. 164, and in the statute there under review there was contained, as one of the elements necessary to constitute the offense, a purpose to destroy competition, and the statute was upheld as being a reasonable classification in both the state and the United States courts.

If we have correctly interpreted the legislative purpose as reflected by the statute, then the classification here is reasonable and not arbitrary. It points to a class separate and distinct from all the others, which class, the legislature judged, has within it the dynamic powers of a monopoly of the gin business which would be hurtful, particularly to the entire tenant class of this state and to the small independent producer of cotton, and generally to the public welfare. The producers would be at the mercy of the chain gin operators, because the ginning of the cotton is necessary to the acquisition of the seed and to putting the cotton itself upon the marts of trade, and this particular class could not severally own cotton gins.

Chapter 305, supra, does not violate section 87 of the Constitution of 1890.

In State v. Speakes, 144 Miss. 125, 109 So. 129, 132, this court said: "A law is general in the sense of such a constitutional provision when it applies to and operates uniformly on all members of any class of persons,

places, or things requiring legislation peculiar to the particular class dealt with by the law.''

We are further of the opinion that the statute does not contravene Amendment 5 of the Constitution of the United States, nor does it violate section 14 of the Constitution of 1890.

As this case was tried and settled upon demurrer to the plea, the prima-facie part of the statute has not been applied in the court below, and, under our universal rule not to consider a constitutional question and decide same until it is actually presented, we are not called upon at this time to pass upon that phase of this cause. We might add that the statute might be constitutional on its face, and yet when the prima-facie presumption is invoked it might be so applied to the facts as to render the procedure in that case violative of the Constitution; so, we pretermit any expression of opinion as to the constitutionality vel non of the prima-facie presumption provided for in the statute. The demurrer to the plea should have been sustained. The case will be remanded to the lower court, and the appellee will be allowed thirty days from the date of the filing of the mandate in the court below in which to file answer.

Reversed and remanded.